1             UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS

3                         No. 1:18-cr-10249-WGY

4

5   UNITED STATES OF AMERICA

6

7   vs.

8

9   MARK MOFFETT

10

11                    * * * * * * * *

12

13                 For Jury Trial Before:
                   Judge William G. Young

14

15           **EXCERPT**:  Closing Arguments

16

17                 United States District Court
                   District of Massachusetts (Boston.)
18                 One Courthouse Way
                   Boston, Massachusetts 02210
19                 Thursday, December 19, 2019

20                    * * * * * * * *

21

22           REPORTER: RICHARD H. ROMANOW, RPR
                   Official Court Reporter
23               United States District Court
           One Courthouse Way, Room 5510, Boston, MA 02210
24               bulldog@richromanow.com

25

1                    A P P E A R A N C E S

2

3    KRISS BASIL, ESQ.
     RACHEL Y. HEMANI, ESQ.
4        United States Attorney's Office
         One Courthouse Way, Suite 9200
5        Boston, Massachusetts 02210
         (617) 748-3387
6        E-mail: Kriss.basil@usdoj.gov
         For the United States of America
7

8    E. PETER PARKER, ESQ.
         Law Office of E. Peter Parker
9        151 Merrimac Street
         Boston, Massachusetts 02114
10       (617) 742-9099
         Email: Peter@parkerslaw.com
11       for the defendant

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     P R O C E E D I N G S

2         (*EXCERPT* Begins.)

3

4    CLOSING ARGUMENT BY MR. BASIL:

5         Good morning, ladies and gentlemen, thank you for

6    your service on this jury.  "I was the puppet master,"

7    you know those words, it's where we began, and it's

8    where we end this case.  The "puppet master," that's how

9    he thought of himself, but that's also how he thought

10   about other people, "puppets," the doctors, the nurses,

11   the patients.  Now they trusted him, they believed in

12   him, they entrusted him with completion of these forms,

13   and he used them to commit fraud.  You've seen the false

14   insurance letters, you've seen the false diagnoses, the

15   false medication histories, medications patients were

16   never on, the false lab values, lab values that don't

17   exist anywhere except on the forms that he filled out.

18   You've seen the false prescriptions.

19        The evidence here shows, beyond a reasonable doubt,

20   that Mark Moffett committed insurance fraud and that he

21   used his friends' identities to do it.  For the next few

22   minutes I'm going to walk you through the evidence that

23   shows that.  Let me start with what's called "The scheme

24   to defraud."

25        Now you've heard a lot about HoFH, "Homozygous

1  Familial Hypercholesterolemia," what it is and what it

2  isn't.  Now you know it's a super rare disease and you

3  know that it is not in any patient records you have seen

4  in this case, not once, not ever.  The doctors just did

5  not have this diagnosis.  And you've heard how important

6  medical records are to these doctors.  They know that

7  other doctors are relying on them when they document

8  care.  They know that when they write down a diagnosis,

9  another doctor is going to see it, and that means

10  continuity of care for the patient.  And you know from

11  the doctors that the medication history matters because

12  a doctor wants to know what meds the patient is on so a

13  doctor doesn't prescribe a medication that causes a bad

14  result.  The doctors did not make this diagnosis.

15      You also know that HoFH is not in the marketing

16  pitch from that man there.  Yes, HoFH is in the official

17  Aegerion documents, but you heard witness after witness

18  tell you that when Moffett talked about this drug,

19  Juxtapid, this $300,000-a-year drug, he didn't say

20  "HoFH," he said "statin intolerance and high

21  cholesterol," that's way broader than HoFH.  And you

22  know it's true because you have Moffett's e-mails where

23  he says the same thing.

24      When Moffett actually tells doctors how to use this

25  drug and who to use it with, he doesn't say "HoFH."

1    When you go into the jury room, look at Exhibits 153,

2    177, and 235, "patients with LDLC over 150," "patients

3    that may be intolerant of statins," "LDL Refractory

4    slash challenging," that's not HoFH, that's high

5    cholesterol, that's statin intolerance, and you heard

6    from the doctors that's not HoFH.

7        He even gives his own criteria for what kinds of

8    patients he thinks they should use.  Ladies and

9    gentlemen, Mark Moffett is not a doctor, he does not get

10   to diagnose patients, doctors do.  The doctors are going

11   to tell you, and you've heard them say, they were

12   prescribing this drug off-label, exactly how he marketed

13   it.  You know where HoFH is in this case, it's on the

14   insurance forms, in the writing you know, it's on the

15   prior authorizations, it's in the false insurance

16   appeals letters.  And you know how HoFH got there, he

17   put it there and you know he did because you've seen him

18   do it.

19       This is his e-mail to Julie Santarelli and Tracy

20   Shelabarger, "Under diagnosis code, don't put

21   'hyperlipidemia,' just put '272.0 HoFH.'  Sorry it's

22   duplication, but insurance companies suck."  Julie

23   Santarelli and Tracy Shelabarger told you that Moffett

24   told them to say that to get the insurance company to

25   pay, and you know it's true because you have Exhibit

1   139, you can see him do it, "Don't put the real

2   diagnosis, say HoFH."

3        Now, ladies and gentlemen, this is a $300,000 a year

4   contract with a narrow indication from the FDA.  You've

5   heard that this drug has a black-box warning, you know

6   that you have to test every single month to make sure

7   that there's no liver damage to the patient.  Well the

8   problem for Mr. Moffett is that there were no HoFH

9   patients, none of these doctors had them, so he just

10  marketed for something else, and the doctors prescribed

11  it for something else.

12       But, ladies and gentlemen, Medicare Part D can't pay

13  off-label, Medicare Part D pays for the medically-

14  accepted indication and that, in this case, is the FDA

15  approval.  Medicare Part D doesn't pay for experimental

16  uses, Medicare Part D pays for what is proven to work in

17  the population it's proven to work in.  That's the

18  condition in the federal rules, and commercial plans

19  have similar limitations.  The insurance company, they

20  look at the diagnosis, they look at the medication

21  history.  This information for them was material.  They

22  assumed and relied on the fact that there was a valid

23  prescription issued by the physician.

24       "Here, Doctor, sign this," that's not a valid

25  attestation, you have to know what you're doing when you

1    sign a document.  These doctors never intended to attest

2    to a diagnosis consistent with HOFH.  And these facts

3    were material, that means capable of influencing the

4    insurance company's coverage decision.  It doesn't mean

5    the last final fact that determined everything they did,

6    it just means capable of affecting their decision.  And

7    that's why Moffett said here, "Don't put

8    hyperlipidemia," because he knew the insurance companies

9    cared.

10          For Moffett, fraud was the answer.  His motive was

11   the bonus.  And there they are, thousands of dollars

12   each time he got this done.  And later on, ladies and

13   gentlemen, just for getting the paperwork, he got money.

14   That is the scheme for fraud in this case.

15          Now at the beginning of this case we told you that

16   we would prove two things beyond a reasonable doubt.

17   First, that Moffett had a scheme to defraud by

18   submitting false patient information, false diagnoses,

19   to insurance companies, that's the first thing, and

20   second, that he used the doctors' identities to do it,

21   and you've heard that's their names, their NPI numbers,

22   and their signatures.  That's aggravated identity theft.

23   You've now seen the evidence and you know the evidence

24   proves he committed these crimes.

25          Judge Young is going to instruct you on all of the

1    elements of these crimes.  He'll explain, for example,

2    that wire fraud requires an interstate fax or an e-mail

3    or a phone call, the wire doesn't have to be the thing

4    that is fraudulent, it can just be in furtherance of the

5    fraud scheme, and I expect Judge Young is going to give

6    you a verdict slip that helps you see where the wires

7    are for each of these.

8         I expect that Judge Young will tell you that you

9    can convict Moffett whether he did everything by himself

10   or whether there were some other people involved or

11   whether he used other people to commit the fraud.  So if

12   you find that Moffett committed his crimes by using

13   Marti Quinones, or Julie Santarelli, or Tracy

14   Shelabarger, you can still find him guilty if he

15   willfully used them to commit the crime.

16        Let's use -- let's go to an example of that.  (On

17   screen.)  This is Mr. Moffett's e-mail to Marti Quinones

18   telling her how to fill out the form, "Here are the

19   answers for the attached form."  He tells her to report

20   a false diagnosis of HoFH.  You know it's false because

21   it's not in the medical record.  You know it's false

22   because Dr. Dande told you he didn't diagnose this

23   patient with HoFH and he has never diagnosed any patient

24   with HoFH.  You know it's false because Allyson Gough

25   didn't even know what HoFH was.

1     Moffett told Quinones to say that the patient had

2   a skin fiberglass test.  You know that's false.  Nobody

3   even knows what that test is.  Nobody knows.

4     Moffett even attached the form to fill out, he

5   knew what questions the insurance company was asking, he

6   knew what mattered to the insurance company.  It's all

7   right there.  When Quinones faxed that form, that's the

8   wire, the crime is complete, and with that evidence you

9   can convict him.  Moffett made $11,000 from this.  That

10  was the puppet master at work.  And you can hear the

11  puppet master at work in real-time.

12     Remember that phone call with his girlfriend,

13  Julie Santarelli, when she called on Patient Leslie

14  Griffith, Dr. Mishkel's patient, and this is Count 2 of

15  wire fraud that you're going to be looking at.  When you

16  go into the jury room, listen to Exhibit 54-01, the call

17  to CVS, and what you're going to hear is the CVS person

18  says, "What's the diagnosis?"  And she just says,

19  "Hyperlipidemia," it rolls right off her tongue, because

20  it's in the record.  It's easy.  But then she stumbles,

21  she says "Homozygous Familial Hyperlipidemia," she still

22  gets it wrong, but then she corrects it and she finally

23  gets it out, "Homozygous Familial Hypercholesterolemia."

24     Now that's a lie, HoFH is not in that patient's

25  medical record and Santarelli testified that Moffett was

1  right there.  Now listen to it.

2          (Plays audio.)

3          Ladies and gentlemen, "He's telling me what to

4  do," that's what she told you, and you know that's true

5  because he bragged about it.  There it is, "Griffith

6  approved after Mishkel nurse appealed to BCBS over the

7  phone.  I was the puppet master as she spoke."

8          Santarelli's boyfriend, Mark Moffett, told her to

9  lie and she did.  Santarelli may not have known what

10 HoFH was, but she knew it wasn't in the chart, that's

11 why she couldn't just read it off the chart on that

12 call.  And Moffett, he made $9500 from that.  If you

13 want to see his bonuses, you can look at Exhibit 312,

14 they're all there.  And let's talk about the rest of

15 Dr. Mishkel's patients, there they are, and there are

16 the counts, the corresponding counts.

17         For each of these counts, you have the treatment

18 notes that show there was no diagnosis of HoFH.  You

19 then have the prescriptions, the statements of medical

20 necessity with false information, the prior

21 authorization forms with false information, you have the

22 insurance letters with false information.  Dr. Mishkel

23 and Santarelli told you that those forms are in

24 Moffett's handwriting.  That's the same handwriting on

25 the letter that Moffett gave to Teresa Caldwell, the

1   same writing that is in Mr. Moffett's employment file at

2   Aegerion -- and that's in Exhibits 2 through 7, and here

3   are examples.

4       In the upper corner, that's the letter that he

5   gave to Teresa Caldwell.  Here are the charts for Teresa

6   Caldwell.  (On screen.)  You know the false information

7   on these forms is in that handwriting.  Here's another

8   example.  (On screen.)  That's from the employment file.

9   Look how "Nilesh Goswami" is written when you look at

10  how it's written on the forms for Dr. Nilesh Goswami.

11  This is an example of one of these forms.  There's the

12  handwriting you know.  There's the diagnosis that

13  Dr. Mishkel tells you did not exist.  This is Wire Count

14  6, Identity Count 13, it's an e-mail, that's your wire

15  in this case.

16      And look also, there's a drug listed here,

17  Nevacor, it says it's current.  Now there's a treatment

18  note from that day, it's Exhibit 101.  Go look at it.

19  There's no Nevacor that day.  There is another note

20  hidden away from 2003 -- a note from 2003 is not current

21  in 2014.  That is a false medication history, because

22  Mr. Moffett knew that the insurance companies were

23  looking at what other drugs patients were on.  It was

24  material to them.  That is a trick to trick the

25  insurance company.  So let's talk about Teresa Caldwell

1    and the other patients.

2         Teresa Caldwell wasn't even Dr. Mishkel's patient,

3    she told you that, Santarelli told you that, and Mishkel

4    told you that, and they all told you there is no

5    diagnosis of HoFH, and they all told you the real

6    diagnosis was statin intolerance, and you know that

7    Moffett knew that because he wrote it in the letter he

8    gave to Caldwell, it says that Dr. Gill and Dr. Mishkel

9    wanted it, wanted this drug for her because she was

10   statin intolerant.

11        But then there's a lot of other gobbledygook in

12   that letter, things about "LDL receptor activity" and

13   "blunted response."  There's no evidence of that in the

14   record, that wasn't something she had ever heard from a

15   doctor.  I guess she heard that from Dr. Moffett,

16   Dr. Moffett came up with that, Dr. Moffett apparently

17   had information about her genes.  Now Caldwell didn't

18   get Juxtapid in the end, but you know what?  Mark

19   Moffett got $2500 just for getting in those forms.

20        Roy Young?  There's no diagnosis in Roy Young's

21   chart either.  Dr. Mishkel told you that he did not

22   diagnose that man with HoFH, but Santarelli put it on

23   the form and she did it because Moffett told her to,

24   just like he told Tracy Shelabarger and just like you

25   saw him tell Shelabarger and Santarelli in Exhibit 139.

1    And Moffett?  Well he got $9,000 on that one.  And you

2    know that Moffett knew he was committing fraud.

3         He has a good friend, Dr. Goswami.  He goes to

4    Dr. Goswami with a letter, Dr. Goswami looks at that

5    letter and says, "No, I will not sign that letter

6    because it has a false diagnosis," the diagnosis of

7    HoFH.  That diagnosis is not in the medical record.

8    Dr. Goswami told you that this patient isn't even

9    consistent with HoFH because of the triglyceride level,

10   it excluded the diagnosis.  But Moffett sent that letter

11   anyway.  And when the insurance company denied again, he

12   sent a second letter, that's Exhibit 79, that's the one

13   that Dr. Goswami told you he never even saw.

14        And then Dr. Dukkipati, the patient, Crystal

15   Houston, there's that writing you know again.  Now,

16   Dr. Dukkipati, he told you he didn't diagnose this

17   patient with HoFH, and that diagnosis again is not in

18   the chart.  And Dr. Dukkipati told you that this

19   signature on this form right here, that's not his

20   signature.  But remember, like Dr. Goswami,

21   Dr. Dukkipati told you that this patient's diagnosis

22   isn't even consistent with HoFH because of the

23   triglyceride levels on the patient.

24        Now, Mr. Moffett, he knew about that fact.  You

25   saw in Sarah Whipple's compliance decl. the criteria

that Aegerion itself used to find patients, if
triglycerides are over 300, you're out, unless you have
a genetic test.  You saw all of those criteria in that
compliance decl., they also have the triglyceride level.
And you can look at the insurance form for Blue Cross
Blue Shield, it also has the triglyceride level.  He
knew that.  It's not consistent with HoFH, it's not
HoFH, that's what the doctors testified to.

And so Dr. Dukkipati, he helps you understand a
fundamental fraud here, that's the prescription itself.
The attestation there is not valid, the doctor would not
sign that form knowing that attestation was there.  And
again, ladies and gentlemen, "Here, Doctor, sign this,"
that is not getting a valid attestation.  And you know
the insurance company wouldn't pay if it weren't a
prescription.  And you know from Heather Rezendes, the
Compass lady, Compass wouldn't even process a claim if
they didn't have that prescription.  And Moffett, he got
$9,500 for this one.

Now Goswami, Mishkel, Dukkipati, they were
Moffett's friends, they trusted him, they knew him, they
socialized with him, he was welcome in their offices,
their office staff knew him, he could go in when he
wanted, he had access to the fax machine.  He got
signatures on forms, he had to, the fraud doesn't work

1   without signatures.  The signatures looked like the

2   doctors' signatures.  They have to.  You don't commit a

3   crime like this unless the signatures look right, you've

4   got to get them one way or another.

5        How about the Mishkel swoosh we talked about?

6   It's not that hard, try it yourself, "zoop," there it

7   is.  But you know Dr. Mishkel wasn't signing letters

8   when he wasn't even in the office, when he was away in

9   another place testifying, you know he wasn't signing

10  letters as if he were the "President of Prairie

11  Cardiovascular," no one signs using a title they don't

12  have.  It's just a mistake he made?

13       I expect Judge Young is going to tell you an

14  additional fact here and that is -- he's not going to

15  tell you a fact, he's going to tell you a law about the

16  facts, and that is for aggravated identity theft, you

17  can't give permission to someone else to use your

18  identity to commit a crime, that's not with lawful

19  authority.  I'll say that again.  There is no lawful

20  authority to go out and use an identity to commit a

21  crime.  The false information on all of these forms,

22  when you look at the prior authorizations, it's in the

23  handwriting you know.

24       So we come to Dr. Nallamothu and there's that

25  writing you know.  A diagnosis of HoFH?  Yes.

1    Dr. Nallamothu told you that he did not diagnose Janet

2    David with HoFH.  You can look at her chart.  It's just

3    not there.  But it's the same handwriting.  It's the

4    same handwriting on the forms in Mattoon with Dr. Dande,

5    it's the same handwriting in the office of Dr. Goswami,

6    it's the same handwriting right there.  There's a common

7    denominator and that denominator is the defendant, Mark

8    Moffett.

9         Now, Janet David, she didn't get this drug and on

10   the handwriting -- you can compare this handwriting to

11   know for a fact she didn't.  On one side here you've got

12   the form for Terry Twigg.  Dr. Goswami testified that

13   that is Mark Moffett's handwriting.  And on the right

14   you've got Janet David's.  (On screen.)  Just look at

15   it, it's clear.  As I said, Janet David, she didn't get

16   Juxtapid, but Mark Moffett got $2500 for getting that

17   form right there.

18        You've also seen the forged letter from

19   Dr. Nallamothu.  Dr. Nallamothu did not write that

20   letter.  You know who wrote that letter.  Just compare

21   the letters from all the different doctors, they all

22   pretty much look the same.  They've even got the same

23   titles.

24        Now in January of 2015, Moffett admitted to the

25   Aegerion compliance officer, Sarah Whipple, that he had

written an assurance appeals letter, but he didn't tell Whipple about the letter for Terry Twigg, and he didn't tell Whipple about the letter for Teresa Caldwell, and he didn't tell Whipple about the letter for Barbara Lawrence, and he didn't tell Whipple about the letter for Desandro, he didn't mention any of them because he was hiding it because he knew it was wrong, the only reason why he wouldn't say that.  She asked him, "Are there any other letters?" and he said "No."

Now that was January of 2015.  And Whipple told him, "Don't write letters like that, Mark, don't do it." And you've seen the Nallamothu letter, that was September of 2015.  Moffett knew what he was doing was wrong.

Ladies and gentlemen, this is a scheme to defraud. You know what happened here.  You've seen that fraud plays on trust.  Fraud has to look real to work, it has to look real.  Fraud is getting money with deception. Deception works because it can trick people.  Fraud's a show.  There is no reasonable doubt here, Mark Moffett was pulling the strings on a fraud scheme.  Mark Moffett committed these crimes.  You should return the only verdict that is consistent with all the evidence that you have received and that is guilty on all counts. Thank you.

1        THE COURT:  Mr. Parker.

2        MR. PARKER:  Thank you, your Honor.

3

4   CLOSING ARGUMENT BY MR. PARKER:

5        Good morning, everyone.  When I first got to talk

6   to you directly at the start of this trial, I told you

7   that the evidence would show that Mark Moffett didn't

8   force a single doctor to put a patient on Juxtapid, he

9   didn't pay any doctor to put a patient on Juxtapid, he

10  didn't bribe a doctor or nurse to put a patient on

11  Juxtapid, he didn't trade on friendships or romance to

12  get a patient on Juxtapid, he didn't trick anyone to put

13  a patient on Juxtapid, and he certainly didn't go behind

14  doctors' backs to get Juxtapid prescribed for their

15  patients without their knowledge, and that's what the

16  evidence showed.  Didn't it?

17       I told you that the evidence was going to show

18  that Mr. Moffett, what he did was help busy doctors,

19  busy nurses, and busy staff in doctors' offices get the

20  paperwork done for Juxtapid.  They asked for his help,

21  they wanted his help, they expected him to help, and he

22  helped, in good faith, honestly, with a sincere desire

23  to help make sick people better.  And I think the

24  evidence showed that.

25       And I told you that the evidence would show that

1    Mark Moffett believed and trusted the doctors, some of

2    whom are his friends, that they knew what they were

3    doing, that they were appropriately selecting patients

4    to put on Juxtapid that had HoFH, and that the patients

5    who the doctors wanted to prescribe Juxtapid for did in

6    fact have HoH -- HoFH, and were proper Juxtapid

7    patients, and I think the evidence showed that as well.

8         Now I wish I would have said then that the

9    evidence also would show that Mr. Moffett did not pull

10   or control the strings, that the evidence would show

11   that he was the farthest thing from the "puppet master."

12   Did he make a poor choice of words when he said that?

13   Yeah, probably.  Was it anything more than braggadocio

14   to show his boss that he could get things done and was

15   capable of doing his job?

16        If you learned anything, from sitting here over

17   these last few weeks, is that it was incredibly

18   difficult to get an insurance company to approve

19   coverage for Juxtapid.  Test claims, verbal

20   authorizations, prior authorizations, clinical reviews,

21   denials, appeals, peer-to-peer phone calls, it's an

22   achievement when you can get through all of that and get

23   Juxtapid approved by an insurance company for a patient

24   who needs it.  It's an accomplishment that would spark

25   some pride and satisfaction and maybe a pat on your own

1   back, something you want to take credit for with your

2   boss.  So instead of name calling, let's look at the

3   evidence.  And first let's look at the lay of the land.

4        Juxtapid was approved by the FDA for lowering

5   cholesterol in patients with HoFH.  The FDA gave no

6   guidance and set no criteria for diagnosing HoFH.  It

7   could have required genetic testing, but it didn't.  A

8   clinical diagnosis of HoFH would suffice.

9        The FDA could have set the criteria for a clinical

10  diagnosis, but it didn't do that either, so it was up to

11  the medical community to define the criteria for

12  clinically diagnosing HoFH.  And you've seen that there

13  was no consensus in the medical community on that, there

14  was no single uniform set of criteria that every doctor

15  would apply to make a clinical diagnosis of HoFH, that

16  much is clear from the slide that Mr. Basil liked, when

17  he had Sarah Whipple on the stand, that showed all of

18  the different criteria on the two sides, from scholarly

19  articles, for diagnosing clinically HoFH, with varying

20  minimum LDL levels, um, differing on the nature of

21  family history, high cholesterol, or premature cardiac

22  events, or with other differences.  And then there's the

23  Phase 3 clinical trial for Juxtapid in which all

24  patients had undergone genetic tests and were confirmed

25  with HoFH.  The LDL levels there ranged from 152 and up,

1   and at the low end much lower than the criteria on the

2   slide that Mr. Basil liked.

3        The article that Dr. Dukkipati e-mailed to

4   Mr. Moffett recognizes that clinical diagnoses criteria

5   differ and it identifies some common or core criteria

6   for diagnosing FH, HeFH, and HoFH.  And I bet you never

7   thought you would know what I meant by saying that

8   sentence before you sat on this trial.  Those are

9   important aspects of the lay of the land, the world that

10  Mr. Moffett joined when he started at Aegerion, a

11  clinical diagnosis was all that was required, criteria

12  varied, criteria typically included high LDL levels,

13  family history of cath or cardiac conditions or high

14  cholesterol.  Doctors, who were properly informed that

15  Juxtapid was for HoFH and were made aware of that

16  clinical criteria, would be able to identify HoFH

17  patients in their practices.

18        I want to talk about these doctors who came in

19  here and said some incredible things, I think lie after

20  lie after lie, and I want to start where we ended with

21  Dr. Nallamothu, who's been a cardiologist in the United

22  States for 20 years, I think he said, and who went

23  through a residency as a doctor and then a multiyear

24  fellowship in cardiology before he could start

25  practicing, who writes coherent complicated medical

notes for his patients in perfect English, who reads

technical and professional journals written in English,

yet he tried to tell you that he could not possibly have

written an appeal letter for Janet David because English

is his second language, he would not possibly know how

to use those words.  And that's absurd.

He also had half a dozen cockamamie reasons why

his calendar is really not his calendar.  He has no

control over what's in it.  He has no idea what's in it.

He apparently has no input into what's in it.  If it

says he has a meeting scheduled with Mr. Moffett, he has

absolutely no idea how that could have gotten in there

because, boy, he sure doesn't remember meeting

Mr. Moffett in 2014, months before he prescribed

Juxtapid for his patients, including Janet David.

Didn't he have to say that?  Didn't he have to say,

"Meeting"?  "What meeting, I never had a meeting?"

Because if he had a meeting with Mark Moffett in his

office on November 4th, 2014, it would have to have been

about Juxtapid.

Why else would he see Mark Moffett?  They weren't

friends.  He was a drug rep selling one drug.  They had

no personal relationship.  It wouldn't have been a

social meeting.  If he admitted that he had a meeting

with Moffett, then pretty much everything else he said

1    would unravel, like "I never met or spoke with Mark

2    Moffett."  Like "I didn't know what Juxtapid was till

3    the agents told me about it in 2018."  Like he didn't

4    know what HoFH was?  How about that one?

5        Ms. Hemani asked him how he learned about new

6    medications that were pertinent to his practice and he

7    said something about CMA meetings, office seminars,

8    reading medical journals, interactions with his

9    colleagues, but he didn't really know anything about

10   Juxtapid in 2014 and 2015.  All of his other colleagues

11   did.  So that's just mind boggling.

12       And how did a script get written for Juxtapid for

13   Ms. David in the first place?  There was no treatment

14   note in the medical file -- well there is a treatment

15   note in the medical file, it's marked as an exhibit,

16   it's by Dr. Nallamothu's nurse, Jenn Law, and she says

17   that they're going to talk to Ms. David about Juxtapid.

18   So how did that happen?  Did she do it on her own?  Why?

19   Why would a nurse make that kind of decision?  Or was

20   Mr. Moffett behind it, did he somehow get access to

21   Nallamothu's EMR -- medical records?  "Take Janet David

22   out, try to get her on Juxtapid behind Dr. Nallamothu's

23   back," where's the evidence for that?  If that's what

24   happened, presumably Jenn Law would have known that.

25   Where is she?  Why didn't they fly her in from Illinois

1     to testify that Moffett was behind this?  Doesn't it

2     make more sense that Nallamothu wanted Janet David on

3     Juxtapid and told Jenn Law, who told Ms. David, and made

4     a note of it in the records, and then brought in

5     Aegerion, including the onboarding nurse?

6          But Nallamothu's most consequential lie is that he

7     signed none of the paperwork.  He signed it all.  And

8     you know that from when I walked you through it on the

9     presenter.  I'm not going to belabor this because you've

10    got all of that material and you can look at it in the

11    jury room during your deliberations.  There's the full

12    signatures that we know are his, and the full signature

13    on the top employment agreement, which is marked as an

14    exhibit, and we have the full signatures on the Juxtapid

15    paperwork, and you could look at those.  One we know is

16    his, two he said previously were his, but now they're

17    not, and you can make up your minds.  They're identical.

18    And the short, um, signatures that I pulled out of the

19    medical records and compared to the other Juxtapid

20    paperwork is his as well.

21         So let's talk about Dr. Goswami.  At least he

22    admitted that he signed the Juxtapid form and the

23    statement of medical necessity for his patient,

24    Mr. Twigg, and the REMS enrollment form, but he also

25    said that the first time he saw these forms was when the

1   agents showed them to him during their interviews.

2   What?  "You signed paperwork in 2014 and then you say,

3   'I've never seen it before the agents showed it to me'?"

4        He also said that Fenofibrate was for treating

5   triglycerides and that the entry for a treated LDL

6   level, that I think Mr. Basil showed you, was really an

7   untreated level, because Fenofibrate is not for lowering

8   cholesterol.  Well I put in a label for Fenofibrate, the

9   first page, and the first indication is for lowering LDL

10  cholesterol.

11       But again, Goswami's biggest and most

12  consequential lie is about other signatures.  He says

13  that the signatures are not his on what I call the

14  "proactive letter," um, Exhibit 77, Mr. Basil put it up,

15  where he says he's writing "proactively to get approval

16  for Juxtapid," and the second letter, the appeal letter.

17  The proactive letter is the one that he said Moffett

18  offered to write for him, he said "Okay, write it," he

19  said Moffett showed it to him, and then Goswami says, "I

20  can't sign that, it's not true."  But he told the agents

21  that it was his signature on it.  "I can't sign that,

22  it's not true, but boy that really looks like my

23  signature."  So that's more mind boggling, right?

24       So compare the signatures on those letters with

25  his known signatures that he's admitted to on the

1    statement of medical necessity, the prescription, the

2    REMS enrollment form, and they're the same.

3        Dukkipati also had the same issues with denying

4    here at trial that signatures were his, on several

5    documents, two scripts for Crystal Houston, and a

6    statement of medical necessity and a prior authorization

7    form for Roy Young, he had denied that he signed any of

8    those documents.  And then when I asked him if he told

9    the agents that he did sign all of them previously, on

10   more than one occasion, he said, "I can't remember."

11   Really?  Is that the kind of thing that you don't

12   remember?  I mean you might not remember whether a

13   specific slide in a decl. was shown in an educational

14   dinner in 2014, but would you really not remember

15   whether you identified your signature previously to an

16   FBI agent who's asking you about your signature and your

17   name on this paperwork?  Fortunately we have a known

18   sample of Dr. Dukkipati's signature again from the Pao

19   Bistro sign-in sheet.  I put it up with his other

20   signatures.  You all saw it.  Look at everything.  He

21   signed everything.

22       Now there's something curious about Julie

23   Santarelli's testimony.  I asked her something, she gave

24   an answer, and then I saw her look directly at

25   Ms. Hemani and mouth the word "Sorry."  And maybe all of

1   you saw that --

2         MR. BASIL:  Objection.

3         THE COURT:  No, you can't testify, so that's not

4   evidence.  He did ask her about it, and he may assume

5   that the jury saw something.  You may argue from that,

6   Mr. Parker.

7         MR. PARKER:  Maybe all of you saw that, maybe you

8   didn't.  Maybe some of you saw it, maybe you didn't.

9   But that's not right.  Witnesses are supposed to come in

10  here and tell the truth, not tow the government line.

11        And what about leaving out of her education her

12  bachelor of science degree in biology?  She said that

13  Ms. Hemani only asked her about her nursing training,

14  but that's again for you to remember, whether or not

15  that was the question, and if that's how Ms. Hemani did

16  phrase the question, why did she put it that way?  To

17  bolster a suggestion that Mark Moffett would be able to

18  take advantage of Ms. Santarelli, to pull her strings?

19        And let's talk about Mishkel's signature, the "G"

20  swoosh or the squiggle.  I think he ultimately admitted

21  that because he didn't remember seeing any of the

22  documents with that "G" on it, he could actually have

23  signed them all.  Every "G" swoosh you have seen could

24  have been actually written by Mishkel or by Santarelli,

25  who had authority to sign on Mishkel's behalf.  And

1   isn't it impossible to determine who put the "G" on

2   those documents?  I mean it's not like the "Dukkipati"

3   and all of those signatures which looked complicated and

4   hard to imitate.

5       We know Julie Santarelli brought one draft letter

6   of appeal to Mishkel, but she's not sure which one, for

7   his review, and she says he approved it and it was sent

8   out.  She says she's not sure if Mishkel signed it, but

9   why wouldn't he?  He read it.  He approved it.  Why

10  wouldn't he sign it too?

11      And we also know that Mishkel could have had

12  Ms. Santarelli draft another appeal letter, he thought

13  it might have been the Barbara Lawrence one, and he said

14  that he may have referred it to her to draft.  If that's

15  the case, wouldn't it make sense that she signed that

16  letter too, or that Mishkel did?

17      My point being that if the government contends

18  that Mr. Moffett not only customized appeal letters for

19  Mishkel's use, but signed them as well, the state of the

20  evidence is nowhere near proof beyond a reasonable doubt

21  that he did that.  If Mishkel signed the appeal letters,

22  particularly after reviewing and approving one of them,

23  that's a further indication that Mark Moffett reasonably

24  believed that Mishkel's patients actually had HoFH.  He

25  already would have signed this prescription and this

1    statement of medical necessity, the appeal letter comes

2    later.  The statement of medical necessity and the

3    script say the patient had HoFH.  The appeal letter says

4    the same thing.

5         Goswami, Mishkel, and Dukkipati, all say they were

6    not prescribing -- or they were prescribing off-label.

7    They say that now, that they were prescribing off-label

8    to treat nonHoFH patients, and that's all well and good,

9    but the real question, and one of the critical questions

10   you need to answer, is did Mr. Moffett know that?  Did

11   the government prove that beyond a reasonable doubt?

12   And, no, there's no evidence of that, not even

13   whatsoever, let alone beyond a reasonable doubt.

14        First and foremost, not one of these doctors say

15   that they told Mr. Moffett they were prescribing

16   Juxtapid off-label for nonHoFH patients.  None of them

17   said they told Moffett, "I don't have any HoFH patients,

18   but let's try this out on patients who don't have it and

19   see if it works."  Goswami didn't say that.  Mishkel

20   didn't say that.  Dukkipati didn't say that.  And none

21   of them put in their medical records that they were

22   prescribing for patients -- um, Juxtapid for patients

23   off-label who didn't have HoFH.  None of them even told

24   their patients they were prescribing Juxtapid off-label,

25   even though they knew that the only FDA-approved

indication for it was HoFH.  If Goswami, Mishkel, and

Dukkipati, were prescribing Juxtapid off-label for

patients who didn't have HoFH, that was a close secret

that only they knew, because they never said it to

Moffett and they never made any mention of it anywhere

in their records, and they didn't even tell their

patients about it.

So what they did say to Mr. Moffett about Juxtapid

shows that they knew what it was for.  Mishkel e-mailed

Mr. Moffett with the article from a journal on January

14th, right after Mr. Moffett started with Aegerion,

because he was concerned whether Juxtapid was effective.

Mr. Moffett e-mailed back that the article didn't

specifically address HoFH, but he would fully research

it.  You have this e-mail chain, it's in evidence, and

it's back and forth in one day.

Mr. Moffett had no reason to think that anybody

other than Mishkel would ever see that e-mail -- his

friend.  If Mr. Moffett intended to encourage doctors to

market Juxtapid to patients who didn't have HoFH, a

private e-mail to his friend would have been the perfect

place to do it, "Don't worry, Greg, it's good for

nonHoFH patients too, you can prescribe the heck out of

it," is what he would have said if that's what he

thought and believed.

1          Dukkapati e-mailed Mr. Moffett a different article

2     from a different scholarly journal that unequivocally

3     said that Juxtapid was for treating patients with HoFH,

4     that's in evidence too.  So what these doctors did not

5     say, "We're prescribing Juxtapid off-label," and what

6     they did say, in the Mishkel and Dukkipati e-mails

7     referencing journal articles about what Juxtapid was

8     for, shows that they fully understood what it was for.

9          And what about the other way around, is there any

10    evidence that Mr. Moffett was encouraging these doctors

11    to prescribe off-label for patients who didn't have

12    HoFH?  And I think on balance that's a "No" too.  The

13    evidence shows that Mr. Moffett consistently made

14    efforts to educate these doctors that Juxtapid was only

15    for treating HoFH.  He didn't always use that term in

16    his e-mails and Mr. Basil put up three e-mails from the

17    course of two years of selling Juxtapid, um, that

18    Mr. Moffett didn't put the term "HoFH" in the e-mails,

19    but what he put in those e-mails was the kinds of things

20    that patients would have if they were suitable for

21    Juxtapid, what he put in those e-mails was the general

22    criteria for diagnosing Juxtapid clinically.

23          On the whole, the evidence that you'll have, and

24    you'll see it all, was that Mr. Moffett was upfront and

25    explicit that Juxtapid was for treating HoFH.  You have

the August 24, 2014 infamous Pao Bistro meeting that
nobody can remember anything about.  You have the July
2014 e-mail, that's also marked in evidence, from
Mr. Moffett to all the doctors, saying, um, there's a
Phase 3 study, and of course the Phase 3 study, which is
attached, is on HoFH and it's all about how the patients
have HoFH and how Juxtapid works to treat HoFH.

And Mishkel didn't even admit that Mark -- he did
admit that Mr. Moffett told him that Juxtapid was for
treating HoFH, but he had to say that because he said it
before to government investigators.  But he added
something new at trial, something he'd never said to the
government investigators in his six interviews and in
his sworn-under-oath prior testimony.  Dr. Mishkel said
that Mr. Moffett also told him that Juxtapid was not
just for patients with HoFH, it was also an alternative
for people who have high cholesterol and had no other
alternative.  In other words, Mishkel was saying,
"Moffett told me it could be used off-label."  But he
had been interviewed six times and he had given
testimony under oath and he had never said that before.

Now, the Dande, Gough, Quinones, Gordon Hurst
piece of this case is different because those, um,
witnesses -- well because Dande doesn't say how he's
prescribing off-label, Dande says, "I thought Juxtapid

1    was for FH, and Gordon Hurst had FH," and so Dande

2    thought he was prescribing on-label.  Then he reached

3    out to Marti Quinones, Marti Quinones reached out to the

4    previous Juxtapid rep, that rep reached out to

5    Mr. Moffett, and Mr. Moffett ended up calling them at

6    that office.  And it's important, and you might not have

7    picked up on this, because it's a detail, but that

8    office is in Mattoon, Illinois, Dande's office and

9    Gough's office is in a different town than Mishkel's and

10   Goswami's and Nallamothu's, that was in Springfield.  So

11   this was the first time that Mr. Moffett called on the

12   Mattoon office.  And this is also, if you put all of the

13   evidence together, the first and earliest date that

14   Mr. Moffett, um, had called on any of these doctors

15   offices and started up the process for prescribing

16   Juxtapid, February 28th, 2014.  It was only a month and

17   a half after Mr. Moffett started.

18           THE COURT:  5 more minutes, Mr. Parker.

19           MR. PARKER:  Your Honor, well may I have 10 more

20   minutes?

21           THE COURT:  5.

22           MR. PARKER:  The government makes a big deal out

23   of Gordon Hurst not being Gough's patient, but isn't the

24   question, did Mr. Moffett know that?  Did he know, when

25   he was called to that office, because they had

1    identified a Juxtapid patient, that Hurst was Dande's

2    patient, not Gough's?  Dande didn't even know that.

3    Dande thought at the time that they were both treating,

4    um, Hurst.  So how is Mr. Moffett supposed to know that?

5         But the most important thing out of all of this,

6    um, the Hurst-Dande evidence, is that when it came time

7    to fill out the prior authorization form on March 19th,

8    and Mr. Basil showed you the e-mail from Mr. Moffett to

9    Marti Quinones, um, the prior authorization -- the

10   statement of medical necessity and the script had

11   already been filled out, it had already been signed by

12   Allyson Gough, there had already been an attestation of

13   HoFH for Mr. Hurst, and Dande's name is on the prior

14   authorization form as the prescriber.  Well how did that

15   get there?  That was filled out by, um, Marti Quinones,

16   she identified her handwriting, um, which makes sense

17   because Dande is the one who told her to reach out and

18   call Moffett.

19        Now let's look at Aegerion.  I just have a few

20   minutes left, I guess, so I'm just going to say, and

21   leave it to you to look at the evidence, that all of the

22   witnesses I think lied about their awareness of the REMS

23   program, all of them were aware of the need for the risk

24   of liver hypertoxicity and the need for testing, and all

25   of them knew -- and that was the very reason for the

1    REMS program.

2         I was going to talk about genetic testing, but

3    I'll just say this.  All of the witnesses came in here

4    and said, um, "The only sure way to diagnose HoFH is

5    with a genetic test, and I never did one, so my patient

6    didn't have HoFH."  There's a lot of evidence that came

7    in in this case that undercuts that, and particularly

8    the FDA approval of a clinical diagnosis diagnosing

9    HoFH.

10        I want to end where I ended in my opening and

11   that's that Mr. Moffett trusted these doctors, but he

12   not only trusted them, he respected them.  He trusted

13   that they knew what HoFH looked like because he told

14   them what HoFH looked like.  He trusted that the one,

15   two, or five patients out of the thousands that each of

16   them treated had a clinical diagnosis consistent with

17   HoFH.  He trusted that the doctors were not prescribing

18   Juxtapid off-label, they never told him that they were.

19   He trusted them literally with the lives of his family

20   members, his brother and father were treated by

21   Dr. Goswami, Dr. Mishkel took care of Mr. Moffett's

22   mother.  They went to each other's homes, they ate each

23   other's food.  They went to football games together,

24   they socialized, they did favors, they watched each

25   other's kids when they needed it.  They all knew

1    Mr. Moffett for many years professionally and some of

2    them were his friends for many years.

3         I asked Mishkel if he prescribed Juxtapid because

4    he wanted his patients to get better?  And he said

5    "Yes."  And I said, "Isn't that what Mr. Moffett wanted

6    too?"  And he said "Yes."  No hesitation, no double-talk

7    or evasion on that question, one simple word, "Yes."

8         I've got two simple words, "Not guilty."  Send

9    Mark Moffett home with his family the way he walked into

10   this courtroom today, as an innocent man, so he can put

11   his life back together and back on track.  Thank you.

12        THE COURT:  A brief rebuttal from the government?

13        MR. BASIL:  Yes, your Honor.

14        THE COURT:  Brief.  Go ahead.

15

16   REBUTTAL ARGUMENT BY MR. BASIL:

17        Ladies and gentlemen, Mr. Moffett must be the

18   unluckiest man in the world because he has a drug for a

19   one-in-a-million kind of patient and yet he found a

20   whole bunch of them with doctors in just one practice,

21   Prairie Cardiovascular, and the doctors, according to

22   Mr. Parker, he just said they all diagnosed these

23   patients clinically with HoFH, the only problem is the

24   only person they told in the world was Mark Moffett.

25   They didn't tell the patients, they didn't put it in

1   their charts.  And when Mr. Parker says that the charts

2   don't say that they were prescribing off-label?  Ladies

3   and gentlemen, that's just not true, if you go and look

4   at those charts, they say they're prescribing Juxtapid

5   for statin intolerance.

6         And, Mr. Moffett, was he marketing off-label?

7   Yeah, it didn't say "HoFH."  Did he have his own

8   criteria, Dr. Moffett, did he have his own criteria?

9   Well those criteria don't appear anywhere except in his

10  e-mails, ladies and gentlemen.

11        And when Mr. Parker says, "Oh, Dr. Mishkel never

12  said before that Moffett was marketing off-label for

13  statin intolerance?  Well, ladies and gentlemen, go look

14  at Moffett's e-mail to Mishkel in the spring of 2014, I

15  showed it to you in my closing argument, what he says

16  there is it's for statin intolerant patients.

17        But let me just end with this simple fact for you.

18  On the day that Mark Moffett was in Mattoon to get the

19  signatures on the forms from Ally Gough, she told you

20  that Gordon Hurst wasn't there that day.  This is

21  Exhibit 29 in evidence, it's the HIPPA consent form for

22  Gordon Hurst, ladies and gentlemen, and there's that

23  handwriting on it that you know.

24        Ladies and gentlemen, when that man needed a

25  signature on a form and he needed to get it, he did it.

 1   That's fraud.  That's all you need to know.  You should

 2   find him guilty on all counts.

 3          (*EXCERPT* ends.)

 4

 5                  C E R T I F I C A T E

 6

 7       I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

 8   hereby certify that the forgoing transcript of the

 9   record is a true and accurate transcription of my

10   stenographic notes, of the aforementioned *EXCERPT*,

11   before Judge William G. Young, on Thursday, December 19,

12   2019, to the best of my skill and ability.

13

14

15   /s/ Richard H. Romanow 02-21-20

16   _____

17   RICHARD H. ROMANOW  Date

18

19

20

21

22

23

24

25