UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 18-10249-WGY |
| | ) | |
| MARK T. MOFFETT | ) | |

**Defendant's Sentencing Memorandum**

Defendant Mark Moffett submits this memorandum to assist the court in arriving at a reasonable sentence that is sufficient and not greater than necessary to promote all statutory sentencing goals. For the reasons set forth below, that sentence is time served, plus a single two-year sentence on and after that, to be served on supervised release with a condition of home confinement. The court should not require that Mr. Moffett serve any additional time in jail because the Bureau Of Prisons is ill-equipped to provide proper medical care for his complicated constellation of serious medical conditions, and because those conditions put him at extreme risk of serious illness including death if he were to contract the Coronavirus or one of its deadly variants in a prison setting.[1]

**Argument**

1. **The Requested Sentence Is Appropriate For a Person With Mr. Moffett's History and Characteristics**

At trial, the government tried to paint Mr. Moffett as a selfish, amoral, greed-driven person who would do anything to earn a commission. Someone who would knowingly push a drug on patients who did not need it for the sole reason that it would put money in his pocket. Indeed, as someone who did not care if the drug was harmful to patients. As a despicable, unscrupulous, monster who would go as far as to "seduce" and maintain a serious relationship

---

[1] The court has advised that in the event it imposes an incarcerative sentence, it will hold a

with a nurse for the sole reason of gaining entry to confidential patient information at her office

so he could push more drugs and further line his pockets.[2]

    None of that was borne out by the evidence. Despite the verdict, the truth came out at

trial. From the government's own witnesses. The truth is that Mr. Moffett was motivated to help

patients get better. Seriously ill patients suffering from debilitating, persistent cardiovascular

conditions that would kill them prematurely. Who were out of options for treatment, unable to

get their cholesterol levels down to healthy target levels.

    More than one of the government's witnesses testified that Mr. Moffett wanted patients to

take Juxtapid because he believed that it would make them better. He wanted to help the patients.

That was the one kernel of truth the doctors who Mr. Moffett called on, several of whom had

also been his friends, told at trial.

    That is who Mr. Moffett is. A selfless, generous, compassionate human being driven by

the need to help others, even where he has nothing at all to gain. That is how he has lived his

entire life and how he will continue to live it until his dying day. That is the constant thread

running through the extensive letters provided by 26 family members, long-standing friends,

professional colleagues, neighbors, and even a landscaper.

### A.     Mr. Moffett Has Always Helped Persons Less Fortunate Than Him

    Mr. Moffett began helping persons less fortunate, who were typically physically or

mentally afflicted, at a very early age. His mother took him along with her when he was just six

or seven years old to help deliver meals on wheels to homebound people in the community. *See*

---

[2]    There was no seduction. Both Mishkel and his nurse, Julie Santarelli, testified at trial that it was Mishkel's idea that Mr. Moffett and Santarelli start a relationship and that Mishkel urged Santarelli to do so. Yet the government included the thoroughly discredited narrative that Mr. Moffett "seduced" Santarelli to gain access to patient records in offense conduct it submitted to the Probation Office.  *See* PSR at ¶ 24.

MJ Moffett Letter, Ex. A 0034-35.[3] *See also* Ex. A 0042. His older siblings, Theresa, a pharmacist, Dan, a dentist, Jeanne, a nurse, and the late Jim, a food salesman, all chose careers helping others, three of them in the medical field. Willis Letter, Ex. A 0051.

During his high school years, Mr. Moffett volunteered at the Brother James Court, a home for severely mentally disabled men. MJ Moffett Letter, Ex. A 0034. *See also* Ex. A 0042. He also worked at Montvale Estates, a senior assisted living community where he served dinner and interacted with the residents. MJ Moffett Letter, Ex. A 0016.

After obtaining a degree in psychology, Mr. Moffett continued working with mentally ill patients at the McFarland Mental Health Center. *Id*. Ralph Letter, at Ex. A 0042. Mr. Moffett was the recreation director, planned field trips, and counseled the residents. MJ Moffett Letter, Ex. A 0016-17. Mr. Moffett's ex-wife Patricia Morgan writes that Mr. Moffett "has always had a great deal of passion for those with mental disabilities" which she believes "helped guide him into a career in healthcare." Morgan Letter, Ex. A 0036.

Mr. Moffett's sister Theresa actually did guide him into a career in healthcare by suggesting that he become a pharmaceutical salesperson. Willis Letter, Ex. A 0051. Ms. Willis believes that her brother focused on cardiac and cholesterol devices and medications because of an extensive family history of problems in those areas and a premature heart attack that took the life of Mr. Moffett's brother Jim at the age of 55. *Id*.

Mr. Moffett's fiancé Susanne Bolger writes that Mr. Moffett was successful in the industry "because he loved helping patients and making a difference in their lives." Bolger Letter, Ex. A 0006. Sandra Glossop, a friend and colleague for 15 years, writes that Mr. Moffett

---

[3]      All letters of support are attached hereto in alphabetical order as Exhibit A. References to particular letters are by "Last Name Letter" and Bates number, "Ex. A 00xx."

is "passionate about helping physicians deliver the best care for their patients." Glossop Letter, Ex. A 0013.

Cassie Aldridge, who works at a restaurant that Mr. Moffett has frequented and in whom he frequently has confided since 2013, writes that "Mark has a heart for patients. They are real and they mean everything to him." Aldridge Letter, Ex. A 0003.

The best testament to how much Mr. Moffett cares about his patients comes form one of them, Sandra Earp, a true HoFH patient treated by Mishkel.[4] She writes that Mr. Moffett "helped greatly with medical compliances, such as a monthly blood test … staying in touch with my nurse educator, registered dietician, and cardio doctor's staff. The help with insurance approval was a feat in itself." Earp Letter, Ex. A 0010 (no feat should have been required, Earp actually had HoFH). Juxtapid has been, in Earp's words, a "game changer. I am so very grateful and blessed. My Dr. and I agree that this is the best treatment for me." *Id*. Earp concludes: "Mark's help with my cardiac team and setting in motion my forward movement to better health still is amazing to me. I will never be able to pay forward this gift of a healthier life." Ex. A 0012.

> **B.    Mr. Moffett Routinely Helps Friends, Family, Acquaintances, and Anyone Who Needs Help**

Glenn Madden, Mr. Moffett's lifelong best friend, sums it up succinctly: "Mark, to put it mildly, is a person who helps people." Madden Letter, Ex. A 0026.

Indeed, Madden and the other letter writers have witnessed a vast compendium of examples of selfless and generous giving of time, effort, money, and overall support by Mr.

---

[4]    Earp actually did have HoFH and Mishkel prescribed Juxtapid to treat her. When the government subpoenaed records from Mishkel's practice, he took her off the drug and told her to consult with another doctor, who she would not be able to see for eight months. During that period, her health suffered as a result of discontinuing Juxtapid. Her new doctor put her right back on it. *See* Earp Letter, Ex A 0010-0011.

Moffett. He has helped many people with many different needs without ever being asked, without expecting or receiving anything in return, and usually without taking credit or touting his efforts.

He has saved the lives of two persons who were at the figurative ends of their ropes. Literally saved their lives. "Mark saved my life," is how AB bluntly puts it. AB Letter, Ex. A 0004.[5] In 2003, Mr. Moffett came upon AB, who had "constructed a 'helium hood' to effectuate a peaceful suicide." AB writes that despite being completely surprised by what he encountered, and untrained as to how to react, through his "compassion, his empathy, his patience - his innate character," Mr. Moffett "saved my life that day and his support continued when I was in the hospital after." *Id.*

JJ also writes that "Mark Moffett saved my life." JJ Letter, Ex. A 0024. JJ has been sober for over three years from the day Mr. Moffett persuaded him to go to a facility called Gateway where JJ could get treatment for alcohol and substance abuse. JJ did not want to go. Mr. Moffett had to call him multiple times and plead with him "thorough the window of my home for about an hour" before JJ agreed to go with Mr. Moffett. *Id.* By the time they arrived at the facility, JJ was unconscious. Unbeknownst to Mr. Moffett, JJ had taken "a large quantity of pills mixed with alcohol." *Id.* Mr. Moffett called 911 and ran into the facility to get help. JJ writes that Mr. Moffett "was my Angel that day" and that he never gave up on JJ "[e]ven through brutal bouts of rage ands general obnoxious behavior. He was my Angel in 2016 and remains the person who saved my life for me and my family." *Id.*

---

[5]     Initials have been substituted for the names of this and another letter writer ("JJ") both in the body of this memorandum and in Exhibit A because of the intensely personal and sensitive information the writers have chosen to convey to the court. Mr. Moffett will provide the court with un-redacted letters separately and under seal.

Mr. Moffett did not have to do any of that. He had nothing concrete to gain from it. He asked for and got nothing out of it. JJ was not even a close friend. *See* Madden Letter, Ex. A 0026. Mr. Moffett coaxed JJ to get help, literally saved his life, and put up with brutal bouts of rage and obnoxious behavior because that is the way Mr. Moffett is wired. He helps people.

JJ is not the only person Mr. Moffett has urged to go to the Gateway facility to address intractable substance abuse issues. Noe Nieto, a landscaper who Mr. Moffett had hired and had referred to others, had bad substance abuse issues, alcohol and narcotics. Mr. Moffett offered to take him to Gateway, but Nieto refused. Mr. Moffett said "[w]hen you're ready, I'm here." Nieto Letter, Ex. A 0039. Nieto writes that Mr. Moffett never gave up on him. Even after Nieto lost his license and could not drive because alcoholism and DUI convictions: "[h]e could have hired others, but he didn't. … either Mark comes to pick me up to do work, or Susanne does. They haul me to the store, to the bank and back home. They even buy me lunch and give me winter coats when I need them as hand me downs." *Id.*

Who does that? Who even tolerates a substance abusing landscaper, let alone picks them up, drives them around, and helps them run errands? Precious few people could ever be bothered with any of that. Almost everyone would simply get a new landscaper and not think about it for a second.

Mr. Moffett's gift for helping others and his desire to do so was apparent at an early age. In an incredibly heartfelt and touching letter, Dennis Ralph, a lifelong friend, describes how a ten year-old Mr. Moffett skillfully comforted Ralph when he learned, at school, that his father had suddenly died. Ralph ran out of the classroom. Mr. Moffett's class was informed and the teacher asked if anyone would go comfort Ralph, Mr. Moffett volunteered. Mr. Moffett quoted Ralph's favorite song and shared that he had lost his grandfather and an uncle to a heart attack: "Mark

just said those few things and sat with me on the floor against the heater in the boy's bathroom. We sat there for 30 minutes. He said "we can get through this D - your  brothers and sisters and mother will be your parents now." Ralph Letter, Ex. A 0041.

Ralph writes what we all are thinking: "In the boys bathroom at Christ the King, at 10 years of age, Mark got me through the hardest time in my life to that point. How he had the poise at that age I will never know. I believe God was giving him the words to say. Mark said "do you want to walk over to church? Go for a walk outside? Walk home? I will go with you, whatever you want to do." *Id.*

More recently, Ralph called on Mr. Moffett seeking counseling for emotional turmoil caused by a separation from his wife. Ralph writes that: "I hadn't spoken to Mark in a couple of years, but the first thing he said was 'D-Ralph, no matter how much time passes between our conversations, I will always be here for you. So let's hear it and find out how I can help you." *Id*. Ex. A 0041-0042.

Mr. Moffett is also always there for and willing to help members of his family. His sister Theresa writes that after their brother Jim had died at age 55, Jim's 17 year-old son was having trouble making his way in the world. After he was fired from a job, "Mark stepped up, unasked, and helped Joe reassemble himself, coached and mentored him, as he knew Jim would have wanted. He made numerous trips to Chicago, helped Joe reestablish confidence in himself, and literally righted a young man whose life was floundering." Willis Letter, Ex. A 0051.

No one asked Mr. Moffett to do any of this. And he never told anyone he had done it. His sister knows about it only "because my nephew told me, Mark never mentioned it. Mark simply stepped up and quietly made the difference." *Id*. Ex. A 0052.

Mr. Moffett is as generous with his money as he is with his time and effort where money is what would make the difference in the life of the person in need. The restaurant worker, Cassie Aldridge, writes that when she told Mr. Moffett that her father had died, he asked for her address and sent her a $500 check and a note that read "I hope this helps with your father's bills. Please call me if I can help out in any other way. I am always here for you." Aldridge Letter, Ex. A 0002-003.

Holly Huchel, a professional colleague who dated Mr. Moffett for a period of time, and a single mother who did not have a lot of money, writes that he bought her a computer and gave her $500 checks on Christmas, which continued even after their dating relationship had ended. She writes that this "was nothing I asked for and was totally out of the blue. I was amazed by this man's kindness and generosity." Huchel Letter, Ex. A 0022. She would later ask Mr. Moffett for a loan. His response was "Holly, I would be glad to help you and the kids out. But only if you take the money and do not worry about taking it back. I was floored. … He reached out and helped me when he had nothing to gain but to serve others and to help a single mother in need." *Id*.

Huchel is not the only single mother having trouble making financial ends meet that Mr. Moffett has helped. Sarah Strzelewicz, a professional colleague, also received a check from Mr. Moffett after she had confided in him: "I was astounded. I did not ask for anything. Mark simply asked for my address. And then a few days later a check arrived with the simple message 'God bless u and your family.'" Strzelewicz Letter, Ex. A 0046. When she asked why he had sent the money, Mr. Moffett said "let's just say I grew up in a similar situation and I will always help single mothers when I can and when the lord directs me." *Id*.

Susan Bolger writes that Mr. Moffett buys clothes and toys to donate to the Salvation Army for Christmas, has helped a single mother make catholic school tuition payments, and has contributed to a college fund for a student whose mother had died. *See* Bolger Letter, Ex. A 0004. His sister Jeanne Harbour writes that Mr. Moffett has sponsored a premature baby from Africa for two years, given a local mental health provider $500 to cover the deductibles of Medicaid patients so they could obtain completely free services, and contributes $5,000 to $8,000 annually to his church. *See* Harbour Letter, Ex. A 0017.

Mr. Moffett also paid from his own pocket for pain treatment for Sister Margaret Therese, a member of the Dominican Sisters of Springfield Illinois, who experiences considerable pain from cancer and MS. She writes that Mr. Moffett "is a humble man that has helped me and has asked for nothing in return." Therese Letter, Ex. A 0048. Mr. Moffett is also an active parishioner in his local church community and serves at the St. John's Breadline, a Catholic Charities kitchen that provides free hot meals to needy Springfield residents. *See* Rev. House Letter, Ex. A at 0021; Willis Letter, Ex. A 0055.

This is the person the people who know Mr. Moffett the best and for the longest see. This is who they want the court to see. It is not an empty platitude when his lifelong friend Dennis Ralph says that Mr. Moffett "gives more money to charity than anyone I know." Ralph Letter, Ex. A at 0042. Or when Mr. Moffett's brother Dan says that Mark is "one of the most caring, generous, charitable and considerate people I know and I am proud to call him my brother." D Moffett Letter, Ex. A 0033. This is the full picture of the person who stands before the court about to receive a sentence.

**2.      The Requested Sentence Is Appropriate Given the Nature and Circumstances Of the Offense**

The evidence at trial unequivocally shows that no patient who took Juxtapid was harmed or injured.[6] It is not an addictive drug, like oxycontin and other opiates, so no one got hooked or addicted.

The doctors who prescribed Juxtapid all thought that it would be safe and that it would work for patients whose cholesterol levels the doctors were unable to reduce to safe and healthy target levels. Despite their testimony at trial to the contrary, the doctors all knew that Juxtapid was approved only for treating HoFH. They all knew of the risk that Juxtapid could cause a rise in liver enzymes, which is why they made sure that their Juxtapid patients reported for regular blood tests. They knew all of that because Mr. Moffett had told them and it was in the materials he provided.

Juxtapid did work as intended. The evidence at trial shows that the cholesterol levels of everyone who took the drug were lowered.

Mr. Moffett joined Aegerion and sold Juxtapid because he believed that it would help patients who had experienced serious cardiovascular issues and were at tremendous risk for more serious problems and premature death. Susanne Bolger writes that Mr. Moffett "was really excited about the [Aegerion] position because it was a rare disease product and the patients who have this disease don't have many options. I remember him telling me that some of the patients need open-heart surgery in their 30s and have kids that have cholesterols levels in the 400s. He

---

[6]     The PSR notes that one patient "suffered from potential liver damage" and was taken off Juxtapid. That is not entirely accurate. The patient's liver enzymes became elevated, which was a well-documented potential side effect for anyone who took Juxtapid, even for true HoFH patients. In other words, the patient's liver enzymes did not rise because she did not have HoFH and should not have been on Juxtapid. There is absolutely no evidence of that. More importantly, that patient did not suffer liver damage or any other type of harm or injury because the prescriber and Aegerion personnel were monitoring regular blood tests. No patient who took Juxtapid was harmed or injured.

also said he trusted Johanna [Sealscott] when she said it was a great company and a good opportunity." Bolger Letter at 0004-0005.

This is not something Mr. Moffett suddenly hit upon as he was about to join Aegerion, it is not a sentencing theme that he cooked up once he was convicted. Mr. Moffett was always in it to help patients get better, and that was his sole motivation. *See* Section 1A above. It was something he brought to Aegerion. Ms. Aldridge remembers a day at the restaurant where Mr. Moffett was distraught. He told her that the reason he was upset was that a patient had died before he had a chance to start taking Juxtapid. *See* Aldridge Letter, Ex. A 0001.

Mr. Moffett certainly did not join Aegerion for the money. His supporters who know him best, to a person, have attested to that. William Hackney, who has known Mr. Moffett for 35 years, and is also friends with some of the doctors he called on, writes that "Mark is kind and caring and would never risk the health of patients just to make money. It's just not who he is." Hackney Letter, Ex A 0015. Hackney adds that "Mark was successful in his career and at this specific job because he had put in the time and effort to really know his clients, understand their practices, and because he was able to convey the manner in which his product could help patients, not because of any kind of nefarious actions." *Id*. at 0014-0015. Dennis Ralph echoes Hackney: "[k]nowing Mark for 37 years I can tell you Mark is not motivated by money and would never risk his reputation" for money. Ralph Letter, Ex A 0042.

Gary Brett Western, who has known Mr. Moffett since the fifth grade and who is a doctor who also knows Mr. Moffett professionally, writes that Mr. Moffett "has worked very hard in critical care medicine for over 25 years with many patients and physicians. He has worked hand in hand with cardiologists in catheterization labs literally saving lives. His work mattered. He

made a difference. If he had some sort of character flaw that put profit over the care of human lives, I think it would have been exposed much sooner." Western Letter, Ex. A 0049.

So how could an accomplished, principled person of this character stand convicted of the crimes in this case? The short answer is that he worked at Aegerion. It is important to note that Mr. Moffett did not seek out Aegerion. He was recruited by Johanna Sealscott, a former manager and friend who Mr. Moffett knew well and trusted. He did not know when he decided to join Aegerion that it was a thoroughly corrupt organization, rotten from the top, with senior management intent on disregarding the limited purpose for which Juxtapid was approved and hell-bent on marketing it for a broader purpose that was not.[7]

This court found that "Aegerion has engaged in a number of unfair deceptive acts and practices, including outright fraud, *which pervaded corporate management* all designed to increase the use of Juxtapid in circumstances where such treatment was not medically indicated." Memorandum and Order rejecting Aegerion C Plea Agreement, Nov. 20, 2017 (the "Aegerion Order") at 2 (emphasis supplied). The court went on to describe in detail a "truly breathtaking extent of pharmaceutical corporate criminality" by Aegerion management. *Id.* at 15.

Yet not a single individual at any level of corporate management, from Johanna Sealscott who directly supervised Mr. Moffett, all the way to Marc Beer, the CEO, at the top, were charged. Not one individual who worked in the Compass unit and who trained front line workers there to lie and withhold information from insurers to obtain approval for Juxtapid payments were charged. The Compass personnel who were recorded lying to the insurers were not charged.

---

[7]     While this is not an excuse for Mr. Moffett's behavior, it is an explanation, it adds context, and it is a reason to impose a non-incarcerative sentence.

The lack of charges against anyone in a thoroughly corrupt management corps is all the more surprising in light of the corporate decision made by new management to fully cooperate with the government - which this court twice deemed "truly extraordinary" and characterized as "truly remarkable cooperation" that "appears to go beyond the cooperation in the plea agreement." *Id*. at 3, 5, and 6. Perhaps the court was right to ponder whether to "stay its hand" until other criminal investigations the government apparently represented were active ran their course and "the court fairly could evaluate the actual value of Aegerion's cooperation." *Id*. at 7.[8]

Surely such super-cooperation would result in the prosecution of corrupt former management. Had the court stayed its hand, it likely would have been surprised to learn at the end of the day that Aegerion's cooperation produced only this case against Mr. Moffett, a case against another sales representative who paid doctors and nurses at three medical practices in two states to write Juxtapid prescriptions and lied about it,[9] and a case against a doctor in Georgia for the misdemeanor offense of providing protected health care information to his Aegerion sales representative.[10]

There can be no doubt that management directed and was in on multiple crimes, including defrauding insurers to pay for Juxtapid prescriptions for patients who did not have HoFH. Senior management represented to the FDA during the approval process that "everything AEGERION would do upon approval would be 'focused on making sure that [HoFH patients] are the patients who receive the drug'; and that AEGERION had 'no intention of promoting the drug outside of that very narrow, very small patient population, and [would] discourage its use

---

[8]    This is not a criticism of the court or a suggestion that the court somehow got it wrong. The court, after all, had only the information the government and Aegerion chose to provide.

[9]    *United States v. Tackett*, USDC MA Crim. No. 16-cr-10121-ADB.

[10]    *United States v. Montana*, USDC MA Crim. No. 18-cr-10044-MPK.

outside of that patient population." *United States v. Aegerion*, USDC MA Crim. No. 17 CR 10288-WGY at ¶ 13.

Once Aegerion obtained approval, management purposefully trained sales representatives to do exactly the opposite and to market Juxtapid far beyond the limited indication the FDA had approved. *See*, *e.g.*, *id*. ¶¶ 27, 28, and 32 (Aegerion management trained its sales representatives to "market Juxtapid based on "The Art Of Not Defining HoFH,"' to "sell Juxtapid without mentioning HoFH," and to "mislead prescribers about the clinical profiles of patients in the Juxtapid HoFH study and about clinical characteristics typical of HoFH patients," among many, many other things).

When it initially rejected the proposed plea agreement between Aegerion and the government, the court noted "the shocking disparity between the treatment of corporations and individuals in our criminal justice system." Aegerion Order at 15. The court noted that despite the "truly breathtaking extent of pharmaceutical corporate criminality" to which Aegerion admitted, "Aegerion proves beyond peradventure that a forbidden two-tier system pervades our courts. Corporations routinely get "C" pleas after closed door negotiations with the executive branch while individual offenders rarely are afforded the advantage of a C plea. … This is neither fair nor just; indeed it mocks our protestations of 'equal justice under the law.'" *Id*. at 15-16.

This case shows that there is actually an additional third or middle tier. Aegerion, as corrupt an organization that has ever been hauled before a court, gets a C plea, and its executives and management do not even face charges. That was reserved for two lowly sales representatives

and a single doctor. Mr. Moffett is the only one who could go to jail.[11] This is every bit the same type of "forbidden" two tier system the court identified in the Aegerion Order. And it is even more patently unfair.

### 3.    The Requested Sentence Is Appropriate Punishment and Will Serve the Goals Of Specific and General Deterrence

A sentencing court has very broad discretion to fashion a reasonable sentence and must "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007), *quoting Koon v. United States,* 518 U.S. 81, 98 (1996). *See also U.S. v. Martin*, 520 F.3d 87, 91 (1st Cir. 2008) ("a sentencing court should not consider itself constrained by the guidelines to the extent that there are sound, case-specific reasons for deviating from them. Nor should a sentencing court operate in the belief that substantial variances from the guidelines are always beyond the pale.").

Although the court is required to impose a two-year mandatory sentence for aggravated identity theft on and after a wire fraud sentence, what must be fair, reasonable, and not greater than necessary is the total sentence imposed for all counts of conviction. *See Dean v. United States*, ___ U.S. ___, 137 S.Ct. 1170, 1176-1177 (2017) (nothing "prevents a district court from imposing a 30-year mandatory minimum sentence under § 924(c) and a one-day sentence for the predicate violent or drug trafficking crime, provided those terms run one after the other").

For all of the reasons set forth in this memorandum, the appropriate sentence in this case is one that does not require additional jail time. The court should follow the lead of the Eastern District of New York in *United States v. Moneke*, No. 18-CR-442-1 (WFK), 2021 WL 3190382,

---

[11]    Tackett and Dr. Montana both received probationary sentences. *See* PSR at ¶¶ 9-10.

at *4 (E.D.N.Y. July 26, 2021), where the court sentenced the defendant to time served (one day)
on possession of access device count "followed by a 3-year term of supervised release with a
condition of 2 years of home confinement to satisfy the custodial component required by" 18
U.S.C. § 1028A.

The court should impose a sentence that does not require additional jail time because: (A)
Mr. Moffett's behavior was completely out of character and a marked departure from how he had
lived his life prior to joining Aegerion; (B) he is the sole caretaker for his 86 year-old mother;
(C) an incarcerative sentence would be detrimental to his already exceedingly poor physical and
mental health and would interfere with necessary treatment; (D) the loss guideline is empirically
flawed and substantially overstates culpability; (E) the requested sentence is reasonable and
proportionate compared to sentences imposed in other pharmaceutical fraud cases; and (F) Mr.
Moffett already has paid a very heavy price as a result of the charges and his conviction and will
do so for the rest of his life.

Any of these considerations alone would permit the court to impose a sentence below the
advisory sentencing guidelines. In combination, they demonstrate that a sentence with no
additional jail time is reasonable and not greater than necessary to achieve all sentencing goals.

### A.      Mr. Moffett's Behavior Was Completely Out Of Character With How He Has Lived His Life

Even when sentencing courts were required to impose a sentence within the range
dictated by mandatory sentencing guidelines, departing downward where a defendant's behavior
was markedly out of character with how the defendant had behaved and lived was recognized
and encouraged. *See United States v. Grandmaison*, 77 F.3d 555, 563 (1st Cir 1996). *See also
United States v. Bradstreet*, 135 F.3d 46, 56 (1st Cir. 1998) (below-guidelines sentence
appropriate where defendant's conduct was marked departure from the past and unlikely to

reoccur). A departure was available to first-time offenders whose criminal conduct was more than a spontaneous, single incident of bad judgment and extended to "offenders whose course of criminal conduct involves more than one criminal act." *Grandmaison*, 77 F.3d at 563.

In the present advisory guidelines sentencing era, a sentencing court is even more free to vary downward from an advisory guideline range where a defendant has otherwise lived an exemplary life. *See* 18 U.S.C. § 3553(a)(1) (court must consider the history and characteristics of the defendant). As in the mandatory guidelines era, a court may do so when the criminal conduct at issue is more than a spontaneous, one-off, or opportunistic event. *See U.S. v. Howe*, 543 F.3d 128 (3rd Cir. 2008) (affirming probation with home confinement for wire fraud where offense was an "isolated mistake" in the context of defendant's otherwise long and upstanding life, despite assertion that defendant waged a two-year campaign to cover up a six-figure fraud on the Air Force); *United States v. Prosperi*, 686 F.3d 32, 40 (1st Cir. 2012) (upholding probationary sentence 87 months below the low end of the advisory guideline based in part on letters of support that the sentencing court found "sincere, supportive, and, I'm sure, an accurate portrayal of the defendants' lives").

The letters of support here, set forth in detail in Section 1 above, amply fit that description. *See* Section 1, above. *See also* Aldridge Letter, Ex. A 0003 (this case "is not a reflection of this man who has spent his life serving others"); Bybee Letter, Ex. A 0008 ("The charges come as an extraordinary surprise to me and [are] completely out of character for Mark"); Medonia Letter, Ex. A 0030 ("this assessment is also a personal testament on behalf of a friend that I have known for the majority of my life. I respect the jury verdicts rendered in his case, and can simply tell the court that the allegations and convictions do not reflect the person I've known."); Mueller Letter, Ex. A 0038 ("[i]t is very difficult for me to imagine that Mark has

committed the allegations against him as the Mark I know would not participate in this behavior").

### B.      Mr. Moffett Is A Caregiver To His Mother

A sentencing court may impose a below-guidelines sentence where a defendant provides care for a young, elderly, or infirm family member even though policy statements in the advisory sentencing guidelines discourage it. *See United States v. Martin*, 520 F.3d 87, 93 (1ˢᵗ Cir. 2008) (sentencing court "may take idiosyncratic family circumstances into account, at least to some extent, in fashioning a variant sentence"); *See also Prosperi*, 686 F.3d at 49 ("[a]lthough policy statements issued by the Sentencing Commission are relevant in determining the type and degree of idiosyncrasy necessary to support a given variance, they are not decisive") (citation omitted).

A variance may be appropriate where no specialized care is required, or where there is an alternative to the defendant providing the care. *See U.S. v. Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008) (upheld one-year sentence for 100-gram heroin distribution based in part on defendant's responsibilities as sole supporter of 8-year-old son and elderly parents); *U.S. v. Antonakopoulos*, 399 F.3d 68 (1st Cir. 2005) (directing district court on remand of bank fraud case to consider defendant's role as caretaker for brain-damaged son even though alternatives were available); *U.S. v. Dominguez*, 296 F.3d 192 (3d Cir.2002) (district court erred in concluding it could not depart four levels in bank fraud case for defendant who resided with elderly parents, who were physically and financially dependent on her); *U.S. v. Prisel*, 2008 WL 4899451 (6th Cir. Nov. 13, 2008) (upholding sentence of one day plus three years supervised release for possessing child porn where defendant and dependent wife had joint mortgage).

Mr. Moffett lives with and is the sole caretaker of his 86 year-old mother. She has difficulty walking, has ongoing issues with vision due to a decades-long battle with diabetes,

cannot hear well, has hypertension, and recently has had a bout of severe foot pain. Willis Letter, Ex. A 0051. Mr. Moffett does all of his mother's shopping, household chores and cooking, transports her to the doctor, assists her with acute health care issues, and generally provides for all of her needs. *Id. See also* MJ Moffett Letter, Ex. A, 0034. Mr. Moffett's mother writes that "I would be lost without Mark here in my home helping me everyday. I simply cannot do it without him. *Id.*, Ex. A 0035.

> **C.     Mr. Moffett's Is In Very Poor Health and Has A Complicated Monitoring and Treatment Regimen That the Bureau Of Prisons Is Not Adequately Equipped To Manage**

Courts routinely impose below-guidelines sentences for defendants in poor health who require active monitoring. *See U.S. v. Duhon*, 541 F.3d 391 (5th Cir. 2008) (term of probation upheld so first-time offender child pornography defendant could continue to treat with his psychologist); *U.S. v. Polito*, 215 F. App'x 354 (5th Cir. 2007) (term of probation granted for child pornography defendant in part because imprisonment would interfere with his mental health treatment); *U.S. v. McFarlin*, 535 F.3d 808 (8th Cir. 2008) (upholding probation sentence for conspiracy to distribute cocaine based in part on defendant's serious health problems, including anxiety, depression, nervous disorders and heart disease, and significantly reduced life expectancy).

As set forth in greater detail in the PSR at ¶¶ 74-81 and in the accompanying SEALED Supplemental Sentencing Memorandum re: Current Physical and Mental Health, Mr. Moffett presently has been diagnosed with 12 separate serious medical conditions, which predominantly affect his cardiovascular system and his respiratory functioning. He is actively treating with 15 physicians and with a mental health provider. He takes multiple medications daily. Despite the active, hands-on level of care and medication regime, his autoimmune system is severely

compromised, he is prone to infection, and several of his conditions have worsened to the extent that acute emergency care has been required.

**D.      The Loss Guideline Is Flawed and Substantially Overstates Culpability**

**I.      The Loss Guideline Is Empirically Flawed**

A sentencing court may impose a below-guidelines sentence where it disagrees with the policy underlying a provision of the advisory sentencing guidelines. *See Pepper v. U.S.*, 562 U.S. 476, 501 (2011) ("a district court may in appropriate cases impose a non-Guidelines sentence based on a disagreement with the Commission's views"); *Kimbrough v. United States*, 552 US 85, 101 (2007) ("as a general matter, courts may vary from Guidelines ranges based solely on policy considerations, including disagreements with the Guidelines"); *Prosperi*, 686 F.3d at 48 ("post-Booker, a judge may vary from the GSR, disagreeing with details or even major premises"); *U.S. v. Stone*, 575 F.3d 83, 89 (1st Cir. 2009) ("the point of *Kimbrough* is to recognize 'district courts' authority to vary from the crack cocaine Guidelines based on *policy* disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case'") (emphasis in original) (citation omitted).

Few guideline provisions have been subject to more consistent criticism than the fraud and loss provisions. Courts have been particularly skeptical of the guideline loss table, which provides for very large sentencing enhancements based solely on aggregate loss amount: "[b]y making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, … and, by contrast, effectively guaranteed that many such sentences would be irrational on their face." *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012). As Judge Rakoff poignantly explained in *Gupta*:

> The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense. Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results.

*Id*. at 350.

Beyond this general concern about the fraud guideline's "sentencing by numbers" approach, several jurists have criticized the loss table on the grounds that the astronomical sentencing increases it calls for are utterly lacking in empirical support. Indeed:

> the numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology - thus maximizing the risk of injustice. … The Guidelines' calculations for this offense are no longer tied to the mean of what federal judges had previously imposed for such crimes, but instead reflect an ever more draconian approach to white collar crime, unsupported by any empirical data.

*Id*. at 351 (emphasis added); *see also United States v. Musgrave*, 647 F. App'x 529, 538 (6th Cir. 2016) ("[T]here is reason to believe that, because the loss Guidelines were not developed using an empirical approach based on data about past sentencing practices, it is particularly appropriate for variances.").

Disagreement with the Sentencing Commission's "unusual[]" approach to fraud "is a circumstance that a sentencing court is entitled to consider" in imposing a variant sentence. *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016). Sentencing courts have repeatedly varied downward from large guideline sentencing ranges driven by loss amount. *See Gupta*, 904 F. Supp. 2d at 355 (varying downward from GSR of 78-97 months to impose 24-month sentence); *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (noting "the utter

travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense") (emphasis added); *United States v. Herink*, No. 10-CR-169, 2012 WL 3112002, at *7 (D. Neb. July 30, 2012) (imposing sentence of 18 months despite GSR of 51-63 months and explaining that "because the fraud offense Guidelines were promulgated pursuant to Congressional directive rather than by application of the Sentencing Commission's unique area of expertise, the court afford[ed] them less deference than it would to empirically-grounded Guidelines").

For all of these reasons, the Court can and should disregard the mechanical, loss-driven calculation underlying the advisory offense level and the corresponding sentencing range and impose an individualized sentence based on the particular facts and circumstances of this case.

## II.     The Loss Guideline Substantially Overstates Mr. Moffett's Culpability

Even if, despite the reasoning of the authorities cited above, the court agrees with the policy underlying the fraud guideline and its loss table, the government's calculation of loss in this case "substantially overstates the seriousness of the offense." U.S.S.G. §2B1.1, cmt. n.20(C) (stating that downward departure may be warranted on this basis); *United States v. Pol-Flores*, 644 F.3d 1, 5 (1st Cir. 2011) ("[O]ne ground supporting a below-guideline sentence could be that the intended loss attributed to [the defendant] overvalued the seriousness of the offense").

The fraud guideline's principal reliance on loss amount is a particularly poor fit to the facts of this case because Aegerion, not Mr. Moffett, hatched the fraudulent scheme described in the Criminal Information and Deferred Prosecution Agreement to which Aegerion has admitted, senior management instructed and trained lower management employees, sales representatives, and Compass personnel who interacted with insurance carriers to carry out the fraudulent

scheme, Mr. Moffett's participation as a sales representative, while essential, was limited, and he supervised no one. Insurance carrier payments went entirely and directly to Aegerion, and Mr. Moffett received only a fraction of that amount in the form of sales commissions.

Courts have imposed lower than advisory-guideline sentences where a defendant played a limited role, did not participate in planning or organizing, and benefitted financially to a smaller degree than major participants. *See United States v. Costello*, 16 F. Supp.2d 36 (D. Mass. 1998) (below-guidelines sentence for defendants who "did not come up with the scheme at the outset" and whose profit, "at least at the outset, was miniscule" compared to the entire loss); *United States v. Forchette*, 220 F. Supp.2d 914 (E.D. Wis. 2002) (below guidelines sentence where lead defendant masterminded the fraudulent scheme and the defendants profited to a much lesser extent); *United States v. Jackson*, 798 F. Supp. 556 (D. Minn. 1992) (departure from sentence driven by entire loan amount for defendant who only furnished a false appraisal so codefendant could obtain loan, holding that appraiser "was a very minor player and only contributed minimally to the loss. The actions of other persons involved in the loan transaction aided substantially and caused the loss"). *See also U.S. v. Maccaul*, 2002 WL 31426006 (S.D.N.Y. Oct. 28, 2002) (in stock manipulation scheme by brokers, defendant granted downward departure, because "it is virtually impossible to justify imprisoning the defendants before this Court for up to five times as long as the [codefendant] who hired, inspired, and gravely misled them" and because "the loss provision…does not make sense when up to 250 people are participating [in the fraudulent scheme], and the loss is difficult if not impossible to apportion fairly."); *U.S. v. Oakford Corp*, 79 F. Supp. 2d 357 (S.D.N.Y. 2000) (13 level departure granted where offense level overstates gravity of offense; each defendant personally realized "only small

portion of the overall gain" of $15 million and agency tacitly encouraged floor brokers to "push the envelope").

Sentencing courts have also imposed below-guidelines sentences where a defendant did not enter into a scheme to defraud with full knowledge of the fraud and an initial intent to help make it succeed. *See United States v. Broderson*, 67 F.3d 452 (2d Cir. 1995); *United States v. Nachamie*, 121 F. Supp.2d 285 (S.D. N.Y. 2000); *Forchette*, 220 F. Supp.2d at 925. The Second Circuit in *Broderson* upheld a downward departure on this basis reasoning that the defendant's "criminal intent was significantly different from that of the typical fraud defendant. He did not set out to mislead the government." 67 F.3d at 459.

The court in *Nachamie* imposed a below-guidelines sentence because "none of the [defendants] entered the scheme with criminal intent." 121 F.Supp. 2d at 296 (footnote omitted). The court distinguished the defendants from "most defendants convicted of fraud [who] plan to commit a crime and engage in significant and sustained efforts to create a fraudulent scheme or cause it to succeed." It was significant to the court that defendants, doctors who participated in a Medicare fraud telemarketing scheme masterminded by the lead defendant, answered advertisements and believed that they were applying to work in a legitimate clinic, were assured by the lead defendant that the scheme was legitimate and were shown documentation to that effect. *Id. See also Forchette*, 220 F. Supp.2d at 925 (loss overstates culpability where, among other things, defendant's "intent in involving himself in the scheme may have been significantly different than of the usual fraud defendant, *e.g.* he may have entered the scheme with honest intentions").

Mr. Moffett went to work at Aegerion with honest intentions. His friend and former manager Johanna Sealscott, whom he knew and trusted, recruited him. He also benefitted to a

much lesser extent than Aegerion, which received full payments from insurance carriers from which it paid commissions to Mr. Moffett.

For all of those reasons, sentencing him based on the entire amount paid by the insurers would vastly overvalue the seriousness of the offense and his relative culpability.

> **E.     A Sentence Greater Than What Mr. Moffett Requests Would Be Disproportionate Compared to Sentences Imposed In Similar Health Care Fraud Cases**

A sentencing court is required to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. 3553(a)(6). *See also United State*s *v. Tejeda*, 481 F.3d 44, 60 (1st Cir. 2007) ("a district court may consider disparities among codefendants in determining a sentence."); *Prosperi*, 686 F.3d at 49 ("after concluding that [top level manager] would not receive a sentence of incarceration, the court was entitled to take this fact into consideration in fashioning [subordinate manager's] sentence" because subordinate "seemingly participated in the fraudulent actions under the superintendence of his superior—not an excuse but a factor that a judge might reasonably think argues against a higher sentence").

Here, because of the government's decision not to charge *anyone* with any managerial responsibility at Aegerion, the court has been deprived of the ability to compare Mr. Moffett's sentence to the sentences of his more-culpable superiors. Mr. Moffett stands before the court as if he was a rouge employee who acted entirely on his own. Even the PSR refers to the offense as "*Moffett's* fraud scheme," as if Aegerion played no role and his conduct occurred in a vacuum. PSR at ¶ 35 (emphasis supplied).

The court should, however, compare Mr. Moffett's behavior against the only other persons charged with participation in *Aegerion's* top-to-bottom fraud scheme. Both of them

received sentences of probation. *See* PSR at ¶¶ 9-10. Kyle Tackett, a sales representative like Mr. Moffett, marketed Juxtapid to doctors and paid employees and one doctor at three different medical practices in two different states to write Juxtapid prescriptions (unlike Mr. Moffett), presumably for patients who did not have formal HoFH diagnoses. He was charged with obstructing a health care fraud investigation for falsely denying that he had made the payments. *See* Information, *United States v. Tackett*, USDC MA Crim. No. 16-10121-ADB.

Eduardo Montana, a Georgia pediatric cardiologist, was charged with a misdemeanor for providing access to his entire patient database to his Aegerion sales representative so that the representative could identify Juxtapid candidates. News outlets reported that Montana provided his Aegerion sales representative with records of 280 patients, the representative identified 102 patients they could "move forward" with, Montana wrote Juxtapid prescriptions for two patients aged 13 and 14 the Aegerion representative "pushed" for, and Montana subsequently asked Aegerion for a $236,000 grant that Aegerion did not make. *See* Atlanta Journal Constitution, "Metro Atlanta doc gave pharma company child patient data to push meds," Mar. 2, 2018, available at https://www.ajc.com/news/local/metro-atlanta-doc-gave-pharma-company-child-patient-data-push-meds/KtXwI9qezTNoROAkVAKbBI/.

In a similar case involving the submission of fraudulent prior authorizations to insurance carriers, three Warner Chilcott managers were sentenced to probation. Warner Chilcott, like Aegerion, was described by the government as "corrupt to the core. The primary way that this company sold its drugs was by paying kickbacks to doctors, by trying to convince doctors to prescribe their drugs based on taking them out to lavish dinners and signing up high-prescribing doctors as paid speakers and demanding prescriptions in return." *See United States v. Eckles*, USDC Crim. No. 15 CR 10320-GAO, Dkt. No. 44 at 6. *See also United States v. Garcia*, USDC

Crim. No. 15 CR 10310-PBS, Dkt. No. 27 at 3; *United States v. Podolsky*, USDC Crim. No. 15 CR 10132-PBS, Dkt. No. 44 at 4 (D. Mass.). The defendants oversaw a massive fraud scheme that generated just under $18,000,000 in gain to Warner Chilcott, which paid $125 million in criminal fines, forfeiture, restitution, and civil penalties. *See United States v. Warner Chilcott Sales (U.S.) LLC,* USDC Crim. No. 15 CR 10327-FDS, Dkt. Nos. 20 at 1 and 27 at 20.

In other cases involving similar conduct, no individuals were even charged. CareMed Pharmaceutical Services paid $10 million to resolve civil claims that included making false statements to insurers to obtain prior authorizations, fabricating patients' medical information, and falsely stating they were calling from the prescriber's office. *See United States ex rel. Hahar, et al. v. Sorkin's Rx LTD, d/b/a/ CareMed Pharmaceutical Services*, Case No. 12-cv-4366-DLC, Docket No. 20 at 2-4 (S.D.N.Y.).

Shire Pharmaceuticals paid $56.5 million to resolve civil allegations including that Shire employees failed to disclose that they were not members of physicians' staffs when calling insurers to secure prior authorizations. *See United States ex rel. Torres v. Shire Specialty Pharmaceuticals, et al.*, Case No. 08-cv-4795 (E.D. Pa.); *United States ex rel. Hsieh, Harris, and Clark v. Shire PLC, et al.*, Case No. 09-cv-6994, Docket No. 47 at 4-5, 7 (N.D. Ill.). No individuals were charged.

In another similar case in this district, where executives and managers were charged for participating in a fraudulent opioid marketing scheme, no defendant, including the founder, owner, board chair and CEO who masterminded the scheme, received a jail sentence as high as the advisory guidelines set forth in Mr. Moffett's PSR here. *See United States v. Babich, et al.*, USDC MA Crim. No. 16 CR 10343-ADB (12 months plus a day for a regional sales director, 27 months for a regional sales manager, 33 months for a national director of sales, 33 months for a

vice president, and 66 months for the founder, owner, board chair and CEO). The conduct of these Insys Therapeutics executives and managers was much worse than the conduct of Aegerion and the Insys drug, an addictive opioid that ruined patients' lives and caused actual harm, was the antithesis of Juxtapid. In separate cases, Insys sales representatives who pleaded guilty received probationary sentences. *See*, *e.g.*, *United States v. Natalie Perhacs*, USDC SD AL 16 CR00024 (probation); *United States v. Natalie Levine*, USDC CT 17 CR147 (probation with home confinement).

Sentencing Mr. Moffett to no additional jail time is consistent with the sentences imposed in all of these cases where far more culpable managerial personnel engaged in much worse conduct. Tackett (probation) paid doctors' office personnel and a doctor to secure Juxtapid prescriptions. Montana (probation for a misdemeanor) did whatever his Aegerion sales representative (who was not charged with any crime) told him to do, wrote prescriptions for children, and then solicited a six-figure payment from Aegerion. Warner Chilcott executives (probation) paid doctors lavishly in exchange for prescriptions. Uncharged Aegerion management and executives and individuals at the other drug companies identified above escaped criminal charges altogether.

The only fair outcome for Mr. Moffett is a sentence that does not include additional time in jail.

### F.    The Collateral Consequences For Mr. Moffett Have Been Severe

One of the things the district court judge said when sentencing two defendants in *Prosperi* to probation despite an 87-108 month advisory guideline range and a loss in excess of $5,000,000 due to their fraud, was this:

> I think it is very difficult at times, for those of us who are judges or prosecutors or lawyers, to put ourselves in the shoes of a person with no prior experience with the criminal justice system who finds

> himself or herself accused of a crime. I do not think, sometimes,
> we fully recognize the anguish and the penalty and the burden that
> persons face when called to account, as these men are, for the
> wrong that they committed.

686 F.3d at 48. The Court of Appeals rejected the government's argument that this amounted to

preferential treatment for white-collar offenders and held that it was an appropriate consideration

when fashioning a sentence for any first-time offender: "This reasoning applies equally well to

defendants convicted of white-collar and blue-collar crimes. Also, we understand the court's

comments on the burdens of the criminal process to be a comment on the specific deterrence of

these defendants from any future criminal conduct." *Id*.

 Mr. Moffett, a first-time offender who will never reoffend, certainly has experienced the

anguish, penalty, and burden of being called to account in this case. Every day for five years. He

has liquidated almost every asset, his mental and physical health have declined significantly, his

reputation in the community has been ruined, and he will never be able to get a job doing what

he loves most. *See* D. Moffett letter, Ex. A 0032 ("Mark has had the specter of this trial over his

head for five years now. He has liquidated the entirety of his assets and sold his home to defray

the cost of legal representation …[he] is presently under psychiatric care to contend with the

stress and anxiety associated with this litigation and conviction"); Western Letter, Ex. A 0049-

0050 ("Mark has already paid a huge price … The strain on his personal and mental health has

been tremendous. He not only has lost his savings, his home and his livelihood. He has also lost

relationships and has had a huge hit to his reputation").

 In all of this, Mr. Moffett is unique. Marc Beer, Aegerion's high-flying former CEO, who

went on national television and told the world that Aegerion was going to sell Juxtapid to a much

bigger market than then-suspected 3,000-person market of HoFH patients and then relentlessly

drove the company-wide effort to do so, became CEO and Chairman of the Board of another

health care company and presently chairs or sits on six boards. *See*

https://www.crunchbase.com/person/marc-beer.

Sealscott, who ran her Aegerion sales team according to her own rogue best practices

agenda, presently is the Executive District Sales Manager at UCB Pharmaceuticals in Florida.

*See* LinkedIn, https://www.linkedin.com/in/johanna-sealscott-8a38126. Tackett, who obscenely

lists "Aegerion President Club Winner 2014" among his accomplishments, continues to sell

pharmaceuticals through his own business. *See* https://www.linkedin.com/in/kyle-tackett-

94441a12. Montana apparently continues to practice medicine as his license to do so remains

intact. *See* https://gcmb.mylicense.com/verification/Details.aspx?result=70493bae-1959-468e-

94e7-867f8058c0b3.

### 4.     The Court Should Not Order Restitution

The PSR asserts that the court must order that Mr. Moffett pay $1,750,000 in restitution

to the private payers who paid for Juxtapid prescriptions in this case. *See* PSR at ¶¶ 111-112 and

Response to Defendant's Objection No. 10. The Probation Office believes that Mr. Moffett

should be ordered to pay because Aegerion was not. This is another manifestation of the patently

unfair and forbidden two-tier system - one for corporations and another for individuals - that the

court decried in the Aegerion Order.

When Aegerion was sentenced, the parties jointly recommended against an order of

restitution to the private payers Aegerion had defrauded. Aegerion implied throughout its

sentencing memorandum that it could not afford to pay more than what it already had agreed to

pay, which did not include restitution to private payers. *See* Aegerion Sentencing Memorandum,

USDC MA Crim. No. 17 CR10288-WGY, Dkt. No. 32. Aegerion argued that the court did not

have authority to order such restitution because the FDCA violations to which it admitted were

not subject to the Mandatory Victim Restitution Act or the Victim and Witness Protection Act. *Id*. at 19. Aegerion even argued that if the court could order restitution, it should not because it was not clear that the private payers were, in fact, "victims" entitled to restitution. Aegerion argued that the insurers had their own review processes to make sure they were only paying for appropriate Juxtapid prescriptions and if they paid for prescriptions they should not have paid for, it was their own fault. Aegerion also claimed that it would be too time consuming and complicated to sort it all out. *Id*. at 21-22.

The government echoed both concerns. *See* Government's Sentencing Memorandum, USDC MA Crim. No. 17 CR10288-WGY, Dkt. No. 33 at 11 ("Despite the government's best efforts, however, it cannot currently state with sufficient certainty which patients and private payers were victims of Aegerion's misbranding efforts and the economic extent to which they were harmed for purposes of restitution"). *See also Id*. ("Private payers that covered Juxtapid often had detailed prior authorization processes in which clinical reviewers determined if the payer would cover a Juxtapid prescription. … The prior authorization processes should have filtered out off-label prescriptions generated by Aegerion's marketing scheme; to the extent apparent off-label prescriptions made it past payers' review processes, *the government cannot link resulting payments made by payers to Aegerion's efforts to misbrand Juxtapid*") (emphasis supplied).

Not surprisingly, Probation, too, threw up its hands regarding restitution to private carriers, conceding in Aegerion's PSR that it "'cannot be stated with sufficient certainty' who qualifies as a victim and how much economic harm they suffered." Aegerion Sentencing Memorandum, *supra*, at 21.

Now, when the target of restitution is Mr. Moffett, not Aegerion, the government and Probation have no problem identifying private payers, apparently determining that they were not at fault at all for any part of their losses, pinpointing their losses to the penny, and laying it all on Mr. Moffett.

Mr. Moffett adopts all of Aegerion's arguments that the private insurers are not victims entitled to restitution, that they were at fault for not realizing that they should not have paid for the prescriptions written by the doctors in this case, and that it would be too time consuming and complicated to figure it all out and to fashion a restitution order. For those reasons, the court should not order Mr. Moffett to pay any amount of restitution.

Alternatively, the court should order Aegerion to pay restitution in the full amount to the private payers from the $7.2 million dollars set aside to provide patients with restitution. No patient has made a claim and the funds presumably remain fully intact. *See* PSR at ¶ 112.

## Conclusion

For all of the foregoing reasons, the court should sentence Mr. Moffett to time served, plus a single two-year sentence on and after that, and should not require that Mr. Moffett serve any additional time in jail.

MARK MOFFETT
 By his attorney,

/s/ *E. Peter Parker*
E. Peter Parker
 B.B.O. #552720
Law Office of E Peter Parker
The Wheelhouse at Bradford Mill
33 Bradford St
Concord, MA 01742
(617) 742-9099
peter@parkerslaw.com

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on October 25, 2021.

/s/ *E. Peter Parker*
E. Peter Parker