UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

)
)
UNITED STATES OF AMERICA          )
)
v.                                )          No. 18-CR-10249
)
MARK MOFFETT,                     )
                Defendant         )
)
_____ )

**<u>DEFENDANT MARK MOFFETT'S SENTENCING MEMORANDUM</u>**

Mr. Moffett does not, in any respect, seek to depreciate or minimize the gravity of his offense of conviction. He does, however, seek via this Sentencing Memorandum to place his conduct in the proper context, as well as to provide the Court with a full, three-dimensional understanding of the human being whose fate now rests in its hands. Mr. Moffett has, by all accounts, led an exceptional life. As set forth below, two friends state unequivocally that he saved their lives, and many others attest to his consistent positive impact. He stands before this Court having pled guilty to, and accepted responsibility for, a decision he made to take a short-cut to get insurance approval for the cholesterol-lowering drug Juxtapid for one particular patient. This was a very sick patient, who both Mr. Moffett and his doctor believed would benefit from the drug. Even so, what Mr. Moffett did was wrong. It was a fraud, and Mr. Moffett has pled guilty to that fraud. He, of course, should not have instructed an assistant in the medical office to make representations regarding the patient's medical history, without verifying that those representations were correct. But that admitted mistake should not, alone, define Mr.

1

Moffett.  He has already paid a heavy price, including 7 months in federal prison,[1] 7 months more than all other participants in the wide-ranging criminal conduct at his former employer have served combined.  The defense respectfully submits that no further incarceration is required to fulfill the various sentencing purposes set forth in 18 U.S.C. § 3553(a).

## I.     Personal Background

Attached to this memorandum are 28 letters of support from family, friends, and former colleagues which together bring into sharp focus the person now facing sentencing before the Court.  As detailed in these letters, Mr. Moffett has made a habit of quietly helping those in need (asking for and expecting nothing in return), steadfastly offered the kind of friendship any person would cherish, and provided an unwavering foundation of support and care to his mother, fiancé, siblings, friends, and many more.  Mr. Moffett's fiancé writes, "The best way I can describe Mark is 'Champion of the Underdog'.  It doesn't matter what avenue of his life is involved, Mark is always cheering for and trying to help an underdog."  Exhibit 1, Letter of Susanne Bolger; *see also, e.g.*, Exhibit 5, Letter of Jon Jacobs ("I know of countless stories where Mark has helped and reached out to less fortunate souls like me.  Mark is a servant and has a servant's mentality."); Exhibit 13, Letter of Glenn Madden ("Mark, to put it mildly is a person that helps people. . . .  [T]here are countless stories . . . about Mark being someone's angel in a time of need.").

Mr. Moffett is 51 years old.  He was born in Springfield, Illinois to James and Mary Jane Moffett.  PSR ¶ 178.  Mr. Moffett's sister writes that he "was raised in a Catholic home with a

---

[1] Mr. Moffett was convicted after a jury trial, but those convictions were vacated on appeal due to a prejudicial error in the verdict form.

childhood marred by domestic violence." Exhibit 2, Letter of Theresa Willis. Mr. Moffett "witnessed his father physically abuse his [mother] and . . . siblings," including one occasion when "his father punched his siblings Theresa and Daniel." PSR ¶ 179. This violence "had a profound effect" on all five of the children, especially Mr. Moffett who was only "three years old at the time of [his] parents' divorce." Exhibit 4, Letter of Daniel Moffett.

Mr. Moffett's mother was suddenly "confronted with providing for . . . five children, carrying two jobs to make ends meet with a meager contribution of $35.00 per month to take care of Mark. Things were perilous financially but [the family] all worked hard and pulled together to make the best of a bad situation." *Id.* As a result, Mr. Moffet to this day "has a special place in his heart for single moms." Exhibit 1, Letter of Susanne Bolger.

From these "humble beginnings," a six-person family sharing an approximately 1200 square foot home, Mr. Moffett's mother raised a family "that cares for people." Exhibit 13, Letter of Glenn Madden. Despite the hardships in their own lives, Mr. Moffett's mother had he and his siblings participating in Meals on Wheels when Mr. Moffett was not even 10 years old. Exhibit 7, Letter of Dennis Ralph. "Mark's sister Theresa is a pharmacist, his brother Dan is a dentist, and his sister Jeanne is a registered nurse. His entire family is made up of giving and caring people that do for others without the expectation of payback." Exhibit 13, Letter of Glenn Madden. Mr. Moffett also developed an impressive work ethic. *See, e.g.*, Exhibit 3, Letter of Jeanne Harbour (describing Mr. Moffett as "one of the hardest workers I've ever come across"). He would go on to pay his own way through college. *See* Exhibit 4, Letter of Daniel Moffett.

Mr. Moffett's "father struggled throughout his life with mental health issues, and because of this, Mark has always had a great deal of compassion for those with mental disabilities."

Exhibit 8, Letter of Patricia Morgan.  Accordingly, Mr. Moffett embarked on a career in the

mental health field.  He began "working with men with Severe Mental [Illness] at Brother James

Court . . . from 1990-1992.  He served these men and was not paid for two summers.  After

college, Mark went to work at McFarland mental Health Center and worked with Forensic

Mentally Ill patients for $10,000 a year for two years."  Exhibit 7, Letter of Dennis Ralph.

High cholesterol and related cardiovascular conditions have also had a severe impact on

Mr. Moffett's family.  Both his parents and all his siblings have suffered from

hypercholesterolemia.  *See* Exhibit 2, Letter of Theresa Willis.  Mr. Moffett himself has been

taking cholesterol lowering medications "since he was in his twenties."  *Id.*  Mr. Moffett lost his

brother Jim in 2015 at the age of just 55.  Jim "had a host of health problems that included

diabetes, high cholesterol and hypertension."  *Id.*  Mr. Moffett and his family "have discussed the

likelihood of" high cholesterol "contributing to Jim's tragic early passing."  *Id.*  Jim's loss left

Mr. Moffett "heartbroken.  Jim was Mark's protector and family protector against the physical

abuse of his father."  Exhibit 13, Letter of Glenn Madden.  And Jim's was not the first untimely

death in the Moffett family, which had "experienced early death of aunts, uncles, grandfathers

and brothers and sisters due to cardiovascular disease and cancers."  *Id.*

This too impacted Mr. Moffett's professional life.  In 1996 he began "working with

patients experiencing acute heart attacks" and selling a drug to prevent them.  Exhibit 7, Letter of

Dennis Ralph.  He then sold Lipitor for three years, before beginning his work with

interventional cardiologists selling a variety of drugs and devices used to save lives.  *See id.*  Mr.

Moffett threw himself into this important work.  He "would work all hours of the day and night

often starting at 6-7am and sometimes when acute heart attack patients came in at midnight if he

needed to be there." Exhibit 14, Letter of Cassie Aldridge. On at least one occasion, Mr.

Moffett stayed by a patient's side "all night as she was recovering from a stroke" because he

"wanted to be there when the doctor walked in the room first thing in the morning." *Id.*

Mr. Moffett established a hard-won reputation as a respected and ethical pharmaceutical

sales representative. Mr. Moffett's fiancé, who was a professional colleague for 28 years,

attributes his success to his ability "to show the doctors how much he cared about helping their

patients. This went beyond whatever products he was selling at the time. On several occasions

while working in the cath lab, I witnessed ***Mark suggesting that the doctor use his competitor's***

***product because he thought it would be a better choice for that particular patient***." Exhibit 1,

Letter of Susanne Bolger (emphasis added). Mr. Moffett's manager at The Medicines Company

similarly describes him as "a role model for work ethic, teamwork, and principles in a job that he

saw as more than employment, but as a vocation." Exhibit 18, Letter of Brian Thomas Bybee.

Other colleagues strike a remarkably similar chord. *See* Exhibit 19, Letter of James Mueller

(another co-worker at The Medicines Company writing, "I am by nature a sceptic and Mark

'always' exhibited modeled ethical behavior" in the 8-9 years they worked together); Exhibit 20,

Letter of Donald Yakel (interventional cardiologist describing Mr. Moffett as "a true

professional who was an excellent resource to me in my capacity as a physician"); Exhibit 21,

Letter of Crystin Shimkus (nurse who has known Mr. Moffett for over 17 years describing him

as "a man that strives to help people, patients and his colleagues give the best possible care");

Exhibit 22, Letter of Laura Glossop (nurse who has known Mr. Moffett for more than 15 years

stating that "he has always been an outstanding friend and professional"); Exhibit 23, Letter of

Sarah Strzelewicz (Mr. Moffett's co-worker at Solara describing him as "a consummate

professional").  A friend of Mr. Moffett's recalls learning from others, not from Mr. Moffett, that he "had a hand in saving hundreds if not thousands of lives" working in the pharmaceutical industry.  Exhibit 14, Letter of Cassie Aldridge.

This high praise for Mr. Moffett's character is borne out by countless examples (too many to summarize here) described in the attached letters of support.  Time and time again, Mr. Moffett has consistently demonstrated a willingness to lend a hand to friends, neighbors, and anyone else in need, by taking measures both ordinary and extraordinary depending upon what the situation calls for.  The examples copied below illustrate who Mr. Moffett is as a person far better than any summary ever could:

- In 2003, I suffered from severe depression and suicidal ideation.  Mark was a friend who happened to see me on a day when I was constructing a "helium hood" to effectuate a peaceful suicide.  ***Mark had no training for what he stumbled upon but his compassion, his empathy, his patience – his innate character – saved my life*** that day and his support continued when I was in the hospital thereafter.  Exhibit 6, Letter from Illinois Civil Service Commission Judge (emphasis added).[2]

- Mark Moffett saved my life. . . .  I am a recovering alcoholic and today marks 2737 days sober since Mark took me to a treatment facility called Gateway . . . .  When Mark picked me up at my home that day in November 2016[] I was reluctant to leave.  He had called me several times that afternoon and told me to pack a bag for treatment.  After talking to me through the window of my home for about an hour I [g]athered my things and rode in the car with him to Gateway.  I [d]on't remember much of that day but apparently I became unconscious in Mark's car in the parking lot of Gateway rehab.  Mark tried to wake me and immediately called 911 and ran into Gateway to gain medical attention for me. . . .  ***Mark never gave up on me***.  Even through brutal bouts of rage and general obnoxious behavior.  ***He was my Angel in 2016 and remains the person who saved my life for me and my family***.  Exhibit 5, Letter of Jon Jacobs (emphasis added).

- [I]n 1982, I lost my father suddenly to a massive heart attack. . . .  I was at Christ

---

[2] This letter writer's name has been redacted from the public filing to protect his privacy, but the defense will provide it under seal to the Court if needed.

the King School where Mark and I attended . . . .  I [d]idn't know what to do so [I] ran out . . . into the boys bathroom.  [I] was inconsolable. . . .  Then Mark walked in.  The class had been told by our 6th grade teacher that my father had passed away and was there anyone who could check on Dennis in the bathroom?  Mark stepped up at ten years old in a very adult situation. . . .  He shared his loss of his paternal grandfather early in life to a massive heart attack at 41, his Uncle George to a heart attack at 42. . . .  He said, "your brothers and sisters will be your parents now." . . .  ***[I]n the boys bathroom at Christ the King, at the age of 10, Mark got me through the hardest time of my life to that point.***  Exhibit 7, Letter of Dennis Ralph.

- I am a member of the Dominican Sisters here in Springfield Illinois.  I have been diagnosed with cancer and also MS and experience significant pain throughout my entire body. . . .  Over the last few months, Mark has taken care of my treatments for pain out of his own pocket. . . .  Mark is a kind man, listens to me and helps me out with the pain associated with my cancer diagnosis.  Exhibit 10, Letter of Sister Margaret Therese.

- [W]e dated for approximately 6 months in the summer of 2015. . . .  In 2017, I was financially insolvent and reached out to Mark for a loan.  He answered his cell and said "[I] would be glad to help you and the kids out [the letter writer was a single mother].  But only if you take the money and do not worry about paying it back."  I was floored.  He is so kind and generous.  I called him several times in the next few months to offer some payment on the loan and he said "No way . . . , we agreed this was for you and the kids and would not need to be paid back."  Exhibit 9, Letter of Holly Huchel.

- There were many times during our marriage, when he had friends show up on our doorstep in need of a place to stay.  Mark always invited them in. . . .  There were times when he was asked to help with a car that would not start, or someone was locked out of the house, another needed his assistance in building a deck, fixing a fence, moving to a new location, setting up audio-systems in a new house, or taking someone to the hospital.  The list could go on and on. . . .  On one occasion, a friend of his was severely depressed, so right before he was released from the hospital, Mark went over and cleaned his house and stocked his refrigerator with food.  Exhibit 8, Letter of Patricia Morgan.

- Late last year, I had some problems with addiction. . . .  Mark noticed I was behaving a little more oddly.  He came to me at the end of a job [the letter writer was Mr. Moffett's landscaper] and said " . . . ride with me to the bank and I will get you some cash to pay for the work you did today.["]  On the way, he asked me if all was good at home?  I broke down and said "No Mark, I am fighting some demons.["]  He offered his help immediately.  He had worked with men with disabilities and mental illness in the past and offered to take me to Gateway

Foundation . . . .  I said no.  He said, "When you're ready, I'm here."  Exhibit 11, Letter of Noe Nieto.

- I asked my husband, "When you think of Mark, what strikes you about his character?["]  He said it was Mark's generosity and hard work ethic.  I said, "Give me an example."  [H]e said, "Well, like at . . . our youngest daughter's . . . college graduation party, when Mark just put down a couple hundred dollars, paying a large portion of the bill . . . ."  And I said, "Well, [I] [n]ever even knew that." . . . ***And that is just my point.  Mark would never tell me that, in order to take credit. He is happy just being generous, and does not expect anything in return***.  Exhibit 3, Letter of Jeanne Harbour (emphasis added).

Perhaps most impressive, and indicative of Mr. Moffett's character, is the fact that he has continued to be unfailingly selfless and empathetic even throughout the approximately 8 years that he has been living under the constant strain of federal investigation and prosecution.  Jon Jacobs, who states that Mr. Moffett saved his life in November 2016 (during the midst of the investigation), remarks, "The thing that struck me when Mark told me about his legal situation was I just found out about it today. . . .  Not once did he come to me as he knew I was battling my own demons.  Mark was selfless.  His only concern at the time was me."  Exhibit 5.  Another friend similarly writes, "without knowing of Mark's legal battle he was facing he counseled me on my separation from my wife and the emotional situation I was in. . . . I hadn't spoke to Mark in a couple years but the first thing he said was ' . . . no matter how much time passes between our conversations, I will always be here for you.  So let's hear it and find out how I can help you.'"  Exhibit 7, Letter of Dennis Ralph.  Mr. Moffett's own mother, who he served as the primary caretaker for both before and after his incarceration, did not know about Mr. Moffett's legal case until his conviction.  Mr. Moffett's mother writes, "He simply did not want me to worry about him."  Exhibit 12, Letter of Mary Jane Moffett.

Mr. Moffett's fiancé relays that he "continued to be a good and generous person even

during his incarceration," volunteering "in the prison ministry and visit[ing] with cancer patients every Tuesday for 2 hours . . . .  On one occasion, Mark identified that one of his cellmates was experiencing severe hypoglycemia.  He immediately convinced a guard to open the cellmate['s] locker to retrieve the glucose tables that may have saved the inmate['s] life."  Exhibit 1, Letter of Susanne Bolger.

As reflected in the attached letters, Mr. Moffett has been generous with his time and financial resources when it comes to volunteer work and charitable causes:

- I am the supervisor of St John's Breadline here in Springfield, Illinois. . . .  Mark came to us at the height of [t]he Covid pandemic . . . offering to serve meals to the most vulnerable of our community, the homeless. . . .  He volunteered approximately two years and had to give it up due to his incarceration from April to November 2022.  When Mark returned home . . . , he again came back to volunteer weekly and joins us serving roughly 400 meals at breakfast and lunch daily for our community. . . .  ***Until this past week, Mark never once mentioned his legal case***.  That tells me Mark is not here because he has to be, he is compelled to serve and is here because he's spent his life serving and taking care of others.  Exhibit 16, Letter of Victoria Sowers (emphasis added).

- Mark . . . actively gives to Cass County Mental Health.  While he was fighting for himself in court in 2016, he paid all of the copays of their Medicaid patients who needed therapy and mental health treatment, because he was told their copays were only about two dollars, but they still could not afford it.  So he helped about 250 patients there.  Mark does not have the money to do so but he does because of the person he is.  Exhibit 3, Letter of Jeanne Harbour.

- Mark is an active participant and supporter of the annual American Heart Association Heart Ball, volunteers a good deal of his free time at his community church, and contributes his time and service to Meals on Wheels, serving food to those who might otherwise go without.  Exhibit 18, Letter of Brian Thomas Bybee.

- I have seen many occasions of [Mr. Moffett] buying presents for the Salvation Army Giving Tree, helping out a single mom with her child's tuition payment and helping with the college fund of a teenager who lost his mom unexpectedly to suicide.  Exhibit 1, Letter of Susanne Bolger.

## II.   Sentencing Guidelines Calculation

a.   *The government failed to prove its proffered loss amount*

"It is the government's burden at sentencing to prove sentencing enhancement factors by a preponderance of the evidence."  *United States v. Lacouture*, 835 F.3d 187, 189-90 (1st Cir. 2016) (citation omitted).  Accordingly, an enhancement "cannot be applied unless the government . . . prove[s] the predicate . . . facts" to be more likely true than untrue.  *Id.* at 191 n.6.  Moreover, "[o]nly conduct that is criminal may be used as 'relevant conduct' to determine a defendant's offense level."  *United States v. Benns*, 740 F.3d 370, 374 (5th Cir. 2014); *see also, e.g.*, *United States v. Gambaryan*, 654 F. App'x 888, 890 (9th Cir. 2016) (unpublished) (vacating sentence reflecting loss calculation based on Medicare claims where court was unable to "quantify how many of the total claims submitted were fraudulent").

Here, for reasons set forth in PSR ¶¶ 89-153, Mr. Moffett contends that the government has failed to prove any ***criminal fraud*** with respect to the purported relevant conduct.  This is true even though Mr. Moffett readily acknowledges that he could have, and should have, exercised more care in connection with those prescriptions.

Having agreed to dismiss 14 of the 15 counts against Mr. Moffett, the government essentially attempts to recreate his 2019 trial, submitting dozens of exhibits and hundreds of pages of testimony (even adding many exhibits that were not introduced at trial).  The documentation goes far beyond the government's (already voluminous) submissions in connection with the 74-page PSR that it had months to prepare.  Notwithstanding the government's efforts, there remain fundamental shortcomings of proof warranting rejection of its

loss calculation.[3]

The government offers what the defense respectfully submits is an overly simplistic view of this case.  It posits that Mr. Moffett acted fraudulently because (a) the doctors testified that they had not diagnosed the relevant patients with HoFH and (b) the patients' underlying medical records do not reflect any pre-existing diagnosis of that condition.  While the defense does not dispute either of those factual premises, the government overlooks several important points.

First, a forensic document examiner with 40 years' experience, including with the New York City Police Department and U.S. Postal Inspection Service, John Breslin, has concluded that all four doctors underlying the charged counts relied upon by the government as relevant conduct probably signed Juxtapid paperwork attesting to their patients' diagnoses of, or consistent with, HoFH, *i.e.*, the very paperwork that the government contends was fraudulent. *See* PSR ¶¶ 108, 111, 114-15, 117, 123, 127, 129, 134, 137, 139, 147-48.[4]  This is powerful new evidence that was not available to the jury at Mr. Moffett's trial.

For the most part, Breslin's conclusions are reconcilable with the doctors' trial testimony. While some doctors initially denied signing certain documents, Drs. Mishkel, Goswami, and

_____

[3] These fundamental defects cannot be cured by the two quotations, carefully selected from hundreds of pages of trial record (and tens of thousands of pages of discovery), wrested from all context, and highlighted by the government in its introduction.  Neither Mr. Moffett's bragging to his supervisor about assisting in obtaining a Juxtapid approval nor his stating, based on guidance from Aegerion, that diagnoses of hyperlipidemia and HoFH were "duplicat[ive]" proves his intent to defraud, especially not in the face of the countervailing evidence outlined *infra*.  In both of these instances, the medical office had previously submitted paperwork, the defense contends signed by Dr. Mishkel, attesting to a diagnosis of, or consistent with, HoFH. *See* Trial Ex. 51; PSR ¶ 117.

[4] Breslin was unable to reach a conclusive opinion due to the unavailability of original signatures for examination.  *See* PSR ¶ 108 n.8.  His full report is attached hereto as Exhibit 29.

Dukkipati all ultimately acknowledged it was at least possible (even in some cases likely) that they had signed the paperwork.  *See* PSR ¶¶ 109 (Dr. Mishkel "acknowledged on cross-examination that the signatures looked like his and that he 'could have written many' of them"),[5] 134 (Dr. Goswami "testified that the signatures on" the relevant patient's statement of medical necessity, prescription authorization form, and prior authorization form "were his, though he did not remember signing them.  Specifically, Dr. Goswami could not recall whether Mr. Moffett had presented these documents to him for his signature"),[6] 137 (Dr. Dukkipati "testified that the signatures on the" relevant patient's "statement of medical necessity and prescription authorization forms were 'similar' to his and he could not 'be certain' whether he signed the documents.  In a prior interview with the government, Dr. Dukkipati 'recognized the signature' on the statement of medical necessity 'as his.' . . .  He also acknowledged that he would sometimes sign documents presented to him by his nurse 'without actually reading the document'").  The doctors' equivocal testimony on these issues 4 to 5 years after the fact was understandable given that they all maintained busy interventional cardiology practices at the relevant time and hardly could be expected to have perfect recall of every document they signed on a given day.  *See* PSR ¶¶ 109, 134, 137.

---

[5] The government's reliance on Dr. Mishkel's travel schedule for two of the many forms does not preclude the possibility that he signed them.  The document dated August 14, 2014 was not faxed until August 15, after Dr. Mishkel's travel.  *See* PSR ¶ 114.  The September 17, 2014 letter was not faxed until an hour and 18 minutes after Dr. Mishkel's flight was scheduled to land in Springfield.  *See* PSR Government Objection #6.

[6] Dr. Goswami claimed at trial to have refused to sign an appeal letter for this same patient, but that was contrary to Breslin's opinion that the signature on the letter was probably Dr. Goswami's, as well as Dr. Goswami's own prior statement to government investigators "that he believed the signature on the letter was his."  PSR ¶ 134.

The defense respectfully submits that the foregoing ambiguous testimony, especially juxtaposed with Breslin's unrebutted expert opinion,[7] does not support a finding by a preponderance of the evidence that Mr. Moffett forged any of the doctors' signatures.  And if, consistent with Breslin's conclusions, Mr. Moffett obtained the doctors' own signatures on the forms, the government does not seriously contend that his assistance in the completion and submission of the paperwork rises to the level of criminal fraud.  Mr. Moffett was not a doctor.  He was entitled to rely on the medical professionals prescribing Juxtapid who had access to the patients' medical records to review the information on the forms and verify its accuracy.

Mr. Moffett acknowledges that he could have and should have been more careful.  It was, of course, poor judgment to assist the doctors by filling out medical information in the Juxtapid forms.  "Although Mark was an experienced pharmaceutical rep, this was his first job working with a product that required extensive insurance paperwork, prior authorizations, appeal letters, etc."  Exhibit 1, Letter of Susanne Bolger.  When Mr. Moffett's manager at Aegerion, who would later be promoted to VP of Sales, instructed sales representatives to help with the forms as a "Best Practice," PSR ¶ 94, Mr. Moffet regrettably failed to reject that suggestion as improper, with disastrous results for himself and his family.[8]

---

[7] While the government faults Breslin for not considering various alleged circumstances of the relevant signatures, *See* PSR Government Objection #6, that is not what handwriting examiners do.  Breslin's opinion, based on 40 years' experience (much of it working for the government), that similarities between the signatures on the Juxtapid forms and the doctors' known writing supports a probable conclusion that the doctors signed the forms is an important fact for this Court's consideration.  The Court can consider the likelihood that a doctor seeing a dozen patients in a given day might sign a document without confirming he was identified by the correct title.

[8] This instruction came after the single January 2014 compliance presentation that Mr. Moffett allegedly attended, *see* Trial Ex. 293, and it was repeated with regularity.

But, at the same time, the government has not established that Mr. Moffett input any knowingly false information in the forms presented to doctors for signature. "All the patients at issue had clinical profiles consistent with Aegerion's criteria for Juxtapid patients, as communicated to sales representatives." PSR ¶ 93. While the government alleges, and the defense agrees, that Aegerion was engaged in off-label promotion, the company unsurprisingly did not communicate its guidance in those terms to employees like Mr. Moffett. *See* PSR ¶ 90. Instead, it specifically pushed sales representatives to "identify" HoFH patients, "with the necessary implication that a prescription did not require any pre-existing diagnosis (or preclude the prescribing doctor from making that diagnosis contemporaneously)." PSR ¶ 91.

Notably, excerpts of medical records that did not specifically mention HoFH (and reflected other related diagnoses, such as hyperlipidemia) were included along with the Juxtapid forms in the allegedly fraudulent submissions. *See, e.g.*, Trial Ex. 78 at 4-9; Trial Ex. 96 at 17-18. This constitutes powerful evidence that (a) Mr. Moffett believed in good faith that a pre-existing diagnosis of HoFH was not required; and (b) the insurers, who approved many of the claims, agreed with him.

Mr. Moffett repeatedly communicated that Juxtapid was indicated for HoFH to the relevant doctors. *See* PSR ¶¶ 97-100, 103-05, 132, 136. In fact, Drs. Mishkel, Goswami, and Dukkipati all acknowledged that they knew when they prescribed the drug it was only approved for use in HoFH patients. *See* PSR ¶¶ 105, 132, 136.[9] And there was no evidence that these doctors communicated to ***anyone***, not Mr. Moffett or the affected patients, their purported intent

---

[9] Mr. Moffett communicated this before the two cherry-picked group messages featured by the government, from September 2014 and January 2015, respectively. *See* Dkt. 242 at 4.

to prescribe Juxtapid off-label to non-HoFH patients until they were contacted by government investigators.  *See* PSR ¶ 101.[10]  In these circumstances, when Mr. Moffett was notified of a new prescription from these doctors, it was understandable (though, again, highly regrettable) for him to assume the patient had HoFH.[11]

HoFH is a rare disease, with complicated physical manifestations.  Aegerion did not communicate to Mr. Moffett and his colleagues its intent to sell Juxtapid for patients who did not have HoFH.  Rather, it instructed them to sell the drug for patients who satisfied the purported clinical profile for that disease.  *See* Dkt. 242 at 3 ("[S]ales personnel promoted Juxtapid for assorted symptoms of HoFH . . . .").  A diagnosis of hyperlipidemia was, according to the company, among the "Primary Criteria" for "Potential HoFH Patient[s]."  PSR ¶ 90.   And an Aegerion-created document subsequently used by Mr. Moffett included statin intolerance as a relevant clinical characteristic.  *See* PSR ¶ 92.  Though the criteria articulated by Aegerion may not have reflected the "*established* standard" for diagnosis, PSR Government Objection #2, Mr.

---

[10] While the government objects to this characterization, there is indisputably no evidence that the term "off-label" was ever used by the doctors, with the patients, Mr. Moffett, or anyone else, until they were confronted by government investigators.  "Responsible off-label prescribing requires physicians to . . . inform patients about the uncertainties and potential costs associated with off-label prescribing."  Rebecca Dresser and Joel Frader, *Off-Label Prescribing: A Call for Heightened Professional and Government Oversight*, J. Law Med. Ethics (2009), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2836889/pdf/nihms-180818.pdf.  This was simply not done here.

[11] Dr. Mishkel was also expressly put on notice that multiple relevant patients, including the one patient for whom he denied having prescribed the drug (initials TC), had been prescribed Juxtapid **for HoFH**, further undermining his claim to have intended to prescribe off-label.  *See* PSR ¶¶ 116, 120, 128, 130.  TC told government investigators that Dr. Mishkel specifically mentioned HoFH in discussing Juxtapid with her.  *See* PSR ¶ 126.  One of Dr. Dukkipati's relevant patients similarly told the government that she "believes she was diagnosed with" HoFH, PSR ¶ 138, and another was "very, very knowledgeable about hypercholesterolemia." PSR ¶ 141.

Moffett understandably accepted the guidance provided by his company, which employed medical professionals and high-level executives responsible for complying with the FDA label indication.[12]

Dr. Nallamothu, unlike the other doctors, claimed to have never prescribed Juxtapid.   His testimony on this point is unconvincing for a number of reasons.  Like the other doctors, Breslin concluded that Dr. Nallamothu probably signed one relevant patient's paperwork.  *See* PSR ¶¶ 147-48.  Contemporaneous electronic notes by Dr. Nallamothu's nurse indicated that she had been involved in the decision to prescribe Juxtapid.  *See* PSR ¶¶ 144, 146, 149.  The nurse "testified before the grand jury that no one else had access to her electronic medical record credentials and that she would not have discussed Juxtapid with [any] patient unless she had been told to do so by Dr. Nallamothu or his nurse practitioner."  PSR ¶ 144.  Dr. Nallamothu's first patient "told government investigators that she recalled Dr. Nallamothu 'recommending Juxtapid to her.'"  *Id.*  Another patient's insurer sent a denial letter to Dr. Nallamothu.  *See* PSR ¶ 148.  Moreover, Mr. Moffett caused an Aegerion nurse to meet with all three relevant patients ***in Dr. Nallamothu's office*** to counsel them regarding Juxtapid and HoFH.  *See* PSR ¶¶ 145, 147, 150.  The defense respectfully submits that this undermines any suggestion that Mr. Moffett fraudulently obtained the prescriptions without Dr. Nallamothu's knowledge.

No evidence was presented at trial regarding Dr. Ahmed or his patients.  Instead, the government relies on three reports of pre-trial interviews.  *See* PSR ¶ 73.  But those reports raise

---

[12] The government's citation to the 41[1st] page of one of four attachments to a single email sent to Mr. Moffett and the rest of the sales representatives in his region to prove his purported knowledge of the established diagnosis standard does nothing to undermine the evidence that he was repeatedly told patients like those at issue were "appropriate HoFH patients."  PSR ¶ 90.

serious inconsistencies, regarding which Dr. Ahmed has not been subjected to cross-examination.[13]  "At his first interview . . . , Dr. Ahmed . . . acknowledged 'that he had prescribed Juxtapid,' but claimed he 'was not aware of all of the paperwork involved in it.'  Just two months later, however, Dr. Ahmed admitted that he signed Juxtapid paperwork for several patients, including the three allegedly resulting in actual losses . . . .  Dr. Ahmed explained that he 'would usually get a stack of papers to sign' which likely included the Juxtapid forms at issue.  Several of the relevant documents, including appeal letters, were also included in Dr. Ahmed's electronic medical record, which he claimed to not have enough time to review."  PSR ¶ 151.  Additionally, "[o]ne of the relevant patients . . . recalled Dr. Ahmed's nurse telling him that 'he had [HoFH],'" undermining the doctor's claim to have never treated a patient for that condition.  *Id.*  Along similar lines, "Dr. Ahmed denied any recollection of REMS training, but his nurse recalled Mr. Moffett coming to the office to schedule the training," and a subsequent argument she had with the doctor about renewing the certification.  PSR ¶ 152.  "In preparation for her interview with the government another of Dr. Ahmed's nurses 'found an April 2017 email from . . . Aegerion regarding Ahmed being re-certified as a REMS-enrolled Juxtapid prescriber.'"  *Id.*  The foregoing is too slim a reed to support a more than $400,000 increase to the loss amount.

These were hastily drawn-up forms signed by extremely busy doctors more focused on saving lives than on paperwork.  In these circumstances, the defense respectfully submits that the government's citation to a few specific inaccuracies is not indicative of intentional fraud.  Any inference of fraud is further undermined by the fact that the underlying medical records were

---

[13] Dr. Ahmed's affidavit submitted by the government in advance of sentencing similarly fails to address these inconsistencies.

routinely included in submissions to insurers.  For example, the government neglects to mention that the very same email it cites as falsely reflecting one patient's treatment with Mevacor also included a list of medications that omitted that drug.  *See* Trial Ex. 96 at 23.  Accordingly, this discrepancy is likely the result of (a) a mistake or (b) Mr. Moffett or the Aegerion nurses he worked with receiving information from the patient that was not reflected in her medical records. Along similar lines, the government suggests that Mr. Moffett lied on a prior authorization form by stating that patient CH had no known drug allergies, while her medical records said she was allergic to Crestor and Lipitor.  But those records, which were part of the fax submission, include a prominent check mark (in what the government alleges to be Mr. Moffett's handwriting) next to a notation regarding the patient's intolerance to those medications.  *See* Trial Ex. 89 at 6.  As Dr. Goswami testified at trial, "allergies and intolerance . . . clinically have different significance."  Goswami Tr. 58-59.

The January 2015 compliance investigation emphasized by the government actually refutes its narrative regarding relevant conduct.  The government neglects to mention that the appeal letter at issue there included an attached note saying, "***Please feel free to use it if you like or toss it***. . . .  Just trying to help [the patient] and take some of the burden of paperwork off your office."  PSR ¶ 153 (emphasis added).  The question for this Court is not whether Mr. Moffett, at the direction of his manager, violated corporate policy, but whether he committed an intentional, criminal fraud.  Sending a draft letter for a doctor's consideration, while admittedly improper, does not rise to that level.

Finally, for reasons articulated by the Third Circuit in *United States v. Banks*, 55 F.4th 246 (3d Cir. 2022), the defense respectfully submits that Mr. Moffett's offense level should be

18

calculated based on actual, not intended, losses.  *See also United States v. Patel*, No. 19-CR-80181, 2023 WL 5453747, at *2 (S.D. Fla. Aug. 23, 2023); *United States v. Wheeler*, No. 22-CR-38, 2023 WL 4408939, at *3 (E.D.N.C. July 6, 2023); *United States v. McKinney*, 645 F. Supp. 3d 709, 721 (E.D. Mich. 2022).  The First Circuit has "never squarely addressed a challenge to the commentary's use of intended loss" and has not signaled any disagreement with *Banks*.  *United States v. Gadson*, 77 F.4th 16, 22 (1st Cir. 2023) (rejecting argument on plain error review and noting that conclusion was "not in direct tension with" *Banks*).

> b.  *Fraud guideline overstates the gravity of the offense*

Even if, contrary to the foregoing, the Court agrees with the government's calculation of loss amount, a downward departure or variance is appropriate on the grounds that the ***16-level enhancement*** dictated by the loss table "substantially overstates the seriousness of the offense." U.S.S.G. § 2B1.1, application note 21(A); PSR ¶ 243 (identifying this as "potential grounds for departure").  "[T]he victim loss table . . . presumes that the defendant alone is responsible for the entire amount of victim loss specified in the particular loss range selected by the sentencing court."  *United States v. Reeder*, 170 F.3d 93, 109 (1st Cir. 1999) (citation omitted). Accordingly, "distortive effects extraneous causes may have had on the total 'victim loss' calculation may warrant a departure from the applicable guideline sentencing range."  *Id.*; *see also, e.g.*, *United States v. Jackson*, 798 F. Supp. 556, 557 (D. Minn. 1992) (imposing sentence of 6 months' work release despite $1.4 million loss where the "defendant was a very minor player and only contributed minimally to the loss"); *United States v. Oakford Corp.*, 79 F. Supp. 2d 357, 368 (S.D.N.Y. 1999) (departing downward 13 levels where "each of the defendants personally realized only a small portion of the overall gain or profits of $15 million" and stock

exchange "tacitly encouraged [defendant] floor brokers to 'push the envelope'").

The fraud guideline's principal reliance on loss amount is a particularly poor fit to the facts of this case. Mr. Moffett had no role whatsoever in Aegerion's decision to charge more than $300,000 per year for Juxtapid, which drives the alleged loss into the millions of dollars. *See* PSR ¶ 96. And there is no dispute that the vast majority of any ill-gotten profits flowed to Aegerion, with only a small percentage being paid to Mr. Moffett in bonuses. *See id.* For the foregoing reasons, even assuming *arguendo* that the Court fully adopts the government's position as to relevant conduct, the defense respectfully submits that the total amount of bonuses received by Mr. Moffett in connection with relevant patients is a far more accurate indicator of his culpability than the millions of dollars flowing to Aegerion. Those bonuses, by the government's own calculation, would correspond to an 8-level enhancement, yielding a total offense level of 11 and a GSR of 8-14 months. As discussed below, the sentence Mr. Moffett has already served falls within that guideline range. The government recommendation ignores this issue entirely, seeking to punish Mr. Moffett ***more than*** the average defendant with the same offense level (as calculated by the government) nationwide, many of whom put 100% of the loss in their own pocket. *See* Dkt. 242 at 19.[14]

### III.    A Sentence of Time-Served Is Sufficient But Not Greater Than Necessary to Serve the § 3553(a) Sentencing Objectives

As in all sentencing proceedings, this Court is tasked with imposing a punishment that is "sufficient, ***but not greater than necessary***" to serve the enumerated statutory goals. 18 U.S.C.

---

[14] The defense additionally submits that this Court can and should vary downward from the applicable GSR based on policy disagreement with the fraud guideline's loss table. *See, e.g.*, *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016).

§ 3553(a) (emphasis added).  In the circumstances of the present case, the defense respectfully submits that the incarcerative term already served by Mr. Moffett is sufficient, and that the government's recommended additional term of imprisonment, amounting to only about 3 months, would provide no appreciable incremental value at great cost to Mr. Moffett and his family.

As this Court is fully aware, Supreme Court and First Circuit precedents confer broad discretion to determine the appropriate sentence in individual cases.  *See, e.g.*, *Gall v. United States*, 552 U.S. 38 (2007); *United States v. Thurston*, 544 F.3d 22, 25-26 (1st Cir. 2008) (affirming "dramatic" downward variance under *Gall*).  No longer are district courts bound by the strictures of the guidelines or even permitted to presume that the applicable guideline range is reasonable.  *See Gall*, 552 U.S. at 49-50.  Rather, "once the GSR is properly calculated, sentencing becomes a judgment call for the court, and the court may construct a sentence varying from the GSR based on a complex of factors whose interplay and precise weight cannot even be precisely described."  *United States v. Innarelli*, 524 F.3d 286, 292 (1st Cir. 2008) (citation omitted), *superseded on other grounds*.

a.  *Extraordinary family circumstances*

U.S.S.G. § 5H1.6 authorizes departure from the otherwise applicable GSR for exceptional family circumstances, including loss of caretaking, where:

> (i)  The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking . . . to the defendant's family.
>
> (ii)  The loss of caretaking . . . substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant. . . .

> (iii)  The loss of caretaking . . . is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking . . . irreplaceable to the defendant's family.
>
> (iv)  The departure effectively will address the loss of caretaking . . . .

§ 5H1.6, application notes.

Here, any additional incarceration of Mr. Moffett will cause substantial, direct, and specific loss of essential caretaking to his 88 year-old mother, who is "solely dependent on Mark daily."  Exhibit 1, Letter of Susanne Bolger.  Mr. Moffett's mother has been diagnosed with a number of medical conditions, including diabetes, high cholesterol, high blood pressure, thrombocytopenia, heart disease, osteoarthritis, 80% hearing loss, diabetic retinopathy, eosinophilic esophagitis (and related episodes of choking), asthma, anxiety, and depression.  *See* PSR ¶ 181, Defense Objection #13.  Just a month before Mr. Moffett's surrender date on his subsequently vacated convictions, his mother was in "a horrific car wreck totaling [her] car, breaking [her] ankle, [her] clavicle and [her] arm."  Exhibit 12, Letter of Mary Jane Moffett. "Repair of her ankle involved metal rods being inserted into her tibia, and fusion of the ankle. She was in the hospital for two different surgeries and was in rehabilitation and assisted living for approximately three months."  Exhibit 2, Letter of Theresa Willis.  Since April 2020, except during his incarceration, Mr. Moffett has lived with and provided daily care for his mother.  *See* PSR ¶ 191.  In his sister's words, Mr. Moffett "literally takes care of" their mother "all day, every day."  Exhibit 3, Letter of Jeanne Harbour.  Among other things, Mr. Moffett takes his mother to doctor's appointments, manages her medications, buys her groceries, does her laundry, handles all household cleaning and repairs, and helps her with personal care tasks.  *See* PSR

¶ 181.  Due to her injuries stemming from the car accident, "Mark needs to assist her out of bed, in the kitchen," and "in the bathroom."  Exhibit 3, Letter of Jeanne Harbour.  Mr. Moffett's mother writes, "I feel embarrassed but Mark always reminds me with one simple statement. 'You took care of me when no one else could and I will take care of you.'  He says it all the time when I feel frustrated with my health."  Exhibit 12, Letter of Mary Jane Moffett.

There is, moreover, no adequate alternative care for Mr. Moffett's mother.  His sister Jeanne, who cared for their mother during Mr. Moffett's incarceration, was, just months ago, "hi[t] as a pedestrian by a moving car," causing her to suffer a broken arm, ankle, and pelvis. Exhibit 3, Letter of Jeanne Harbour.  Jeanne accordingly writes that she "will not have the physical strength to care for" their mother "for the foreseeable future."  *Id.*  Jeanne also "lives about 25 minutes away . . . , and is 67 years old."  Exhibit 2, Letter of Theresa Willis.  Mr. Moffett's other sister Theresa lives approximately 90 minutes away, and his brother Daniel is a full-time dentist.  *See id.*   In Mr. Moffett's mother's own words, "the only person I have to depend on is my son Mark."  Exhibit 12, Letter of Mary Jane Moffett.

The defense submits that the foregoing constitutes basis for departure under the guidelines or, alternatively, a variance under 18 U.S.C. § 3553.  *See United States v. Prosperi*, No. 06-CR-10116 (D. Mass.), Dkt. 308 at 54 (Court considering defendants' "important roles as caregivers and caretakers in their families" in imposing downwardly variant sentence of probation, including 6 months' home detention).

b.  *Specific and general deterrence*

Mr. Moffett is a first-time offender, with no prior involvement whatsoever in the criminal justice system.  From a sentencing perspective, this fact is of the utmost importance.  As Judge

Gertner noted in *United States v. Germosen*, 473 F. Supp. 2d 221, 227 (D. Mass. 2007), there is a "demonstrable difference in the recidivism rates of real first time offenders as compared to other defendants in Criminal History Category I."[15]  Moreover, there can be no doubt that Mr. Moffett's offense stands out as an aberration in an otherwise unimpeachable life and career.  *See supra* 5-6.  There is no need to subject Mr. Moffett to further incarceration in order to specifically deter him.

The goal of general deterrence similarly does not require any period of additional incarceration.  *See United States v. Prosperi*, 686 F.3d 32, 48 (1st Cir. 2012) (affirming this Court's rejection of "the view that the interest in general deterrence could only be served by incarceration").  In short, no rational human being aware of what has occurred to Mr. Moffett would ever knowingly and intentionally choose to endure what he has experienced over the last 8 years.  Perhaps most notably, Mr. Moffett has already served 219 days in federal prison for the conduct at issue here before his convictions were vacated on appeal.  According to records obtained by undersigned counsel via a Freedom of Information Act request to the Bureau of Prisons, he earned an additional 50 days' credit towards his release pursuant to the First Step Act, as of October 7, 2022.  Assuming Mr. Moffett continued to participate in similar programming from that date through his release from incarceration, he would have earned another 15 days' credit.  All told, Mr. Moffett has served the equivalent of a 9 and a half month sentence in federal custody.  That, in itself, stands as a powerful deterrent to any similarly situated pharmaceutical sales representative who may otherwise feel tempted to cross the line.

---

[15] The Sentencing Commission, recognizing this fact, recently amended the guidelines to provide a 2-level downward adjustment to defendants, like Mr. Moffett, who have zero criminal history points.  *See* U.S.S.G. § 4C1.1.

*See* Dkt. 242 at 18 (government arguing "[d]rug salesmen . . . do not want to go to jail.  Jail is the penalty that frightens them . . . .").  The timing of Mr. Moffett's incarceration was particularly painful in light of his mother's health situation and recent car accident.  His mother writes, "I was devastated as was Mark.  He felt he was leaving me when I needed him most."  Exhibit 12, Letter of Mary Jane Moffett.

But Mr. Moffett's previous incarceration, while undoubtedly significant, is far from the whole story of the harm he has suffered from his conduct and the ensuing government investigation.  As this Court has previously observed:

> I think it is very difficult at times, for those of us who are judges or prosecutors or lawyers, to put ourselves in the shoes of a person with no prior experience with the criminal justice system who finds himself or herself accused of a crime.  I do not think, sometimes, we fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed.

*Prosperi*, 686 F.3d at 48.  Here, Mr. Moffett has lived under the burden of federal investigation and prosecution for approximately 8 years, more than 15% of his life.  He has been either incarcerated or on supervised release for almost 6 years since his May 2018 arrest.  During that time he "has liquidated the entirety of his assets and sold his home to defray the cost of the legal representation to defend himself," Exhibit 4, Letter of Daniel Moffett, incurring as much as $600,000 in legal fees.  *See* Exhibit 12, Letter of Mary Jane Moffett.  He is also "presently under psychiatric care to contend with the stress and anxiety associated with this litigation and incarceration."  Exhibit 4, Letter of Daniel Moffett.  In light of his guilty plea, Mr. Moffett "has little prospect for future employment in his established occupation.  He has already been disbarred from the pharmaceutical industry where he had established an impeccable work history

for 28 years.  He will be required to completely reinvent himself at age 51."  *Id.*  In short, "Mark is remorseful, his career has been ruined, he is also ruined financially."  *Id.*

The defense respectfully submits that none of the statutory sentencing objectives would be meaningfully served by the government's recommendation of 20 months' incarceration.  That would amount to only about 3 months' additional time in federal prison.[16]  After all Mr. Moffett has already gone through, the defense submits that the incremental value of such a term of additional incarceration would be minimal, at best.  It would be vastly outweighed by the harm Mr. Moffett's re-incarceration would impose on innocent third-parties, most notably his mother.  Re-imprisoning Mr. Moffett would also upend his life, once again, just when he is starting to re-establish himself as a productive member of society.  After spending 8 years living under the strain of this prosecution, the defense respectfully asks that this Court permit Mr. Moffett to finally move forward.

c.  *Circumstances of offense*

Mr. Moffett was recruited to Aegerion by Johanna Sealscott, with whom he had worked closely earlier in his career.  At the time he was "excited about" the opportunity because Aegerion sold a "rare disease product and the patients who have that disease don't have many options.  He was excited about being able to help some very sick patients and although it was a new area for him, he trusted Johanna when she said it was a great company."  Exhibit 1, Letter of

---

[16] In addition to the 284 days' credit that Mr. Moffett has already earned, in the event of a 20-month sentence, he would be eligible 94 days' good time.  *See* 18 U.S.C. § 3624(b).  Assuming Mr. Moffett continued to earn 15 days' First Step Act credits every month for the remainder of his term, *see* 18 U.S.C. § 3632(d)(4), he would complete his 20-month sentence in approximately 150 days.  Mr. Moffett would be eligible to serve the final 2 months of that time in home confinement.  *See* 18 U.S.C. § 3624(c)(2).

Susanne Bolger.  In short, Mr. Moffett embarked on his tenure at Aegerion with honest intentions.  While that fact does not excuse his subsequent conduct, the defense submits it is a pertinent consideration in fashioning a fair and just sentence.

There can be no doubt that during his time at Aegerion, Mr. Moffett sought to help patients who were very sick.  Mr. Moffett's best friend writes, "Mark often talked to me about working with patients with rare diseases and how rewarding it was. . . .  Mark said to me, . . . in my 29 years in this business working for [Aegerion] has been the most professionally rewarding experience of my career because I get to help patients that simply have no alternatives their diseases are so severe and life threatening."  Exhibit 13, Letter of Glenn Madden.  Another friend of Mr. Moffett's recalls seeing him "devastated" when one patient he had been working to get Juxtapid for passed away due to a stroke.  Exhibit 14, Letter of Cassie Aldridge.

A different patient writes that "[h]igh LDL was killing [her]" until her cardiologist, Dr. Mishkel, informed her that she "had HoFH" and prescribed Juxtapid.  Exhibit 17, Letter of Sandra Earp.  Earp, like many of the patients that the government includes in its description of purported relevant conduct, had a pre-existing diagnosis of hyperlipidemia and a history of statin intolerance.[17]  She was, however, subsequently diagnosed by another doctor with HoFH based on clinical criteria.  Juxtapid helped Earp achieve the lowest LDL results she had ever seen, and she continues to take the medication to this day.  *See id.*  Earp writes, "Mark's help with my cardiac team and setting in motion my forward movement to better health is amazing to me.  I will never

---

[17] Discovery materials referenced herein are not attached as exhibits to protect patient health information, consistent with the Protective Order in this case.  *See* Dkt. 29.  The defense will provide copies to the Court under seal if the contents are disputed or required for the Court's review.

be able to pay forward this gift of a healthier life."  *Id.*

Mr. Moffett's conduct with respect to the sole count of conviction was a misguided attempt to help a sick patient, as well as to protect Mr. Moffett's employment at Aegerion.  The patient in question had been diagnosed with "multivessel coronary artery disease and familial hypercholesterolemia, a broader diagnosis which includes (but is not limited to) HoFH."  PSR ¶ 84 (internal quotation marks omitted).  He "had required open heart bypass surgery at the age of just 36."  *Id.*  The patient's doctor, Dr. Dande, asked his assistant to contact the Aegerion sales representative who had previously serviced that office, and that representative forwarded the message to Mr. Moffett.  *See* PSR ¶¶ 84-85.  Mr. Moffett, through the assistant, setup an appointment and subsequently met with a nurse practitioner who undisputedly signed a prescription authorization and statement of medical necessity attesting that the patient in question had "a clinical or laboratory diagnosis consistent with HoFH."  PSR ¶ 86.  The insurance claim was denied.  At that point, Mr. Moffett "had not obtained approval of a single Juxtapid prescription nearly three months after starting at Aegerion" and "was under significant pressure to obtain such prescriptions quickly."  PSR ¶ 88.  He emailed the assistant a blank prior authorization form, providing the answers to be input on the form, including an affirmative response to the question asking whether the patient had a diagnosis of HoFH.  *Id.*[18]  "Mr.

---

[18] Contrary to the government's characterization, the form did not state that the patient "had a skin fibroblast ***test*** to confirm HoFH."  Dkt. 242 at 13 (emphasis added).  Rather, it said the patient had "[s]kin fibroblast LDL receptor activity <20% normal."  PSR ¶ 88.  Aegerion instructed its sales force, consistent with published medical studies, that "patients with clinically defined HoFH" typically have fibroblast activity in this range.  Marina Cuchel et al., *Homozygous familial hypercholesterolemia: new insights and guidance for clinicians to improve detection and clinical management*, European Heart Journal (2014), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4139706/pdf/ehu274.pdf.

Moffett, who did not have access to [the patient]'s full medical records . . . , made the . . . representations in reckless disregard for their truth." *Id.*  As set forth above, Mr. Moffett has paid dearly for that decision, one that he has regretted each and every day for the past 8 years.

It is clear that the criminal scheme at issue in this case, whatever this Court determines its scope to be, originated not with Mr. Moffett, but with Aegerion.  The government, to its credit, acknowledges that the "off-label marketing of Juxtapid . . . was not of Moffett's design," but was instead "part of Aegerion's corporate sales strategy to market Juxtapid for unapproved uses." PSR ¶ 27.  In fact, Aegerion began this unlawful scheme before Mr. Moffett even started work at the company.  *See* PSR ¶ 89.

There is undisputed evidence that Aegerion knew and expressly recognized that the patients it was marketing Juxtapid for did not have HoFH.  *See* PSR ¶ 90 (noting that "Aegerion's financial projections, . . . which were not shared with Mr. Moffett or other sales representatives, forecast 'off-label' revenues significantly greater than on-label").  Mr. Moffett, by contrast, was being told by his employer that patients like those at issue were "appropriate HoFH patients." *Id.*  This message was reinforced by the repeated and effusive congratulations he received from his superiors.  *See* PSR ¶ 93.  "In some instances, those congratulatory messages were forwarded to the highest levels of Aegerion, including the Chief Executive Officer and Chief Operating Officer." *Id.*  Aegerion's role in the offense does not, of course, excuse Mr. Moffett's conduct.  But, the defense submits, it is an integral part of the circumstances of that offense which this Court may consider under § 3553(a).

d.  *Disparities among defendants*

Section 3553(a)(6) specifically directs sentencing judges to consider "the need to avoid

unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *See also United States v. Robles-Alvarez*, 874 F.3d 46, 52 (1st Cir. 2017) (explaining that this subsection is "primarily aimed at national disparities," but "also permits consideration of disparities among co-defendants" (citation omitted)).

Here, the Court need not look far for relevant comparators. Mr. Moffett is one of only three individuals to be charged in connection with the wide-ranging criminal conduct at Aegerion, and he is the only one to have spent a single day, let alone 7 months, in prison.

Aegerion itself pled guilty to misdemeanor misbranding. In doing so, it acknowledged pitching Juxtapid to the FDA on the premise that there were only approximately 319 people in the entire United States with HoFH. *See United States v. Aegerion*, No. 17-CR-10288 (D. Mass.), Dkt. 2-1 ¶ 5. The company did not, however, communicate that information to its sales force, instead telling Mr. Moffett and other similarly situated employees that there were thousands of appropriate patients for Juxtapid (and setting commensurate sales expectations). Aegerion specifically requested, and was denied, approval for an expanded indication that would also include refractory heterozygous familial hypercholesterolemia ("HeFH"). *Id.* ¶ 7. It, however, again did not inform sales representatives of that fact and continued to instruct them that characteristics of refractory HeFH were indicative of a possible need for Juxtapid. *See, e.g.*, *id.* ¶ 12 (Aegerion "continued to develop marketing plans for Juxtapid using the [rejected] 'functional' definition of HoFH that included severe refractory HeFH").

Any attempt by the government to distinguish Aegerion's purported misbranding from the alleged wire fraud by Mr. Moffett must fail. Aegerion, by its own admission, intentionally marketed Juxtapid to patients outside the label indication, *i.e.*, those who did not have HoFH.

30

When doing so, it was indisputably aware that many insurance companies required a diagnosis of HoFH to cover the drug. *See* PSR ¶ 95; Dkt. 242 at 5 (citing coverage requirements for several prominent insurers). High-level company executives were, at the same time, instructing Mr. Moffett and other sales representatives to complete the insurance paperwork for Juxtapid, including attestations that the patients in question had a diagnosis of, or consistent with, HoFH. *See* PSR ¶ 94. If, as the government contends, the sales representatives acted fraudulently, Aegerion and its executives clearly could have been held responsible for such fraud. No executive at Aegerion was prosecuted for the foregoing conduct, notwithstanding Judge Young's finding that such conduct "pervaded corporate management." *United States v. Aegerion*, No. 17-CR-10288 (D. Mass.), Dkt. 23 at 2.

One of the individuals charged was a sales representative. Terrence Kyle Tackett, in sharp contrast with Mr. Moffett, was alleged to have paid kickbacks to healthcare providers when he was selling a different product before he started at Aegerion. *See United States v. Tackett*, No. 16-CR-10121 (D. Mass.), Dkt. 1 ¶¶ 5-6. He provided similar kickbacks thereafter, to six different individuals, when he was selling Juxtapid. *See id.* ¶¶ 11-16. Tackett then lied about the kickbacks in an interview with the federal government. *See id.* ¶¶ 19-22. He was charged with, and later pled guilty to, a single count of obstruction. While Tackett was not charged with wire fraud, the government stated at sentencing that the reason for the kickbacks was so that Tackett "could get into the patient files and ***fill out the forms*** or have a nurse that he was giving kickbacks to fill out the forms in a way to trick, to subvert this REMS program, . . . and also ***to trick the insurers by providing certain kinds of history that could lead the insurer to believe that this is an appropriate patient***." Dkt. 39 at 11-12 (emphasis added). The defense

submits that the foregoing is materially indistinguishable from Mr. Moffett's purported relevant conduct here.  In fact, Tackett acted more egregiously by paying kickbacks in furtherance of his fraudulent scheme and lying about it to the government.  Judge Burroughs ultimately imposed a sentence of 3 years' probation, including 1 year in a combination of community and home confinement, and a $15,000 fine.  *See id.* at 32.  It bears repeating that, while Tackett was the only other sales representative whom the government chose to prosecute, "dozens of Aegerion sales representatives submitted hundreds of forms attesting to a diagnosis of, or consistent with, HoFH for patients whose medical records reflected no pre-existing diagnosis of that condition." PSR ¶ 91.

The remaining individual charged was Eduardo Montana, a Georgia physician alleged to have violated the Health Insurance Portability and Accountability Act ("HIPAA") by disclosing patient information without authorization to representatives of Aegerion.  *See United States v. Montana*, No. 18-CR-10044 (D. Mass.), Dkt. 1 ¶ 7.  Like Aegerion and Tackett, while Montana was not charged with wire fraud, the admitted facts raised the possibility of prosecution for such a charge, at least with respect to the Aegerion personnel involved.  According to the agreed statement of facts, Montana met with an unnamed executive and sales representative from Aegerion.  "The Executive promoted the use of Juxtapid for" patients "not diagnosed with HoFH. . . .  By the end of the meeting, the Executive and the Sales Rep had obtained Juxtapid prescriptions for" two patients.  Dkt. 11-1 ¶ 6.  The government recommended that Dr. Montana be sentenced to 1 year of probation and a $5,000 fine.  *See* Dkt. 32 at 5.  Judge Kelley subsequently adopted that recommendation.  *See id.* at 14.

This Court, in *United States v. Prosperi*, No. 06-CR-10116 (D. Mass.), downwardly

varied from a GSR of 87-108 months to impose a probationary sentence for two defendants convicted of mail fraud involving a loss of more than $5 million.  Dkt. 308 at 4, 55.  The Court observed in that case, "What appears to have been at play was a corporate culture in which pressure, much of it self-generated, was exerted on defendants to perform service for the short-term benefit of the organization without heed to the moral consequences or public harm."  *United States v. Prosperi*, No. 06-CR-10116, 2010 WL 1816346, at *3 (D. Mass. May 6, 2010).  So too here.  The wire fraud scheme for which Mr. Moffett stands convicted was not designed "to enrich [himself] personally."  *Prosperi*, 686 F.3d at 44.  While Mr. Moffett did receive bonuses for obtaining Juxtapid prescriptions, representing just a small fraction of the company's profits, he (unlike the defendants in *Prosperi*) has already served the equivalent of a 9 and a half month prison sentence for his conduct.  Moreover, unlike the defendants in *Prosperi*, Mr. Moffett was not a manager and had little, if any, role in contributing to the corporate culture that, by the government's own account, took root years prior to his arrival.

## IV.    The Court Should Decline to Impose Restitution as Requested by the Government

The mandatory restitution statute defines "victim" as "a person directly and proximately harmed as a result of the commission of an offense . . . including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2).  Thus, restitution requires proof that the claimed loss "would not have occurred but for the conduct underlying the offense" and that "the causal connection between the conduct and the loss is not too attenuated (either factually or temporally)."  *United States v. Cutter*, 313 F.3d 1, 7 (1st Cir. 2002).  The government bears the "burden of demonstrating the

amount of loss sustained by a victim as a result of the offense" by a preponderance of the evidence.  18 U.S.C. § 3664(e).

For all of the reasons set forth *supra* in connection with the guidelines calculation, the defense submits that the government has failed to prove that the purported relevant conduct was part of any criminal fraud, and that restitution should therefore be calculated based solely on Mr. Moffett's offense of conviction.  But, even if the Court disagrees, it should decline to Order the restitution requested by the government for a number of independent reasons.  Despite the defense's timely objections raising all of the below issues (other than the seventh which arose after the final PSR), the government does not acknowledge, much less meaningfully address, a single one.  This silence speaks volumes.

First, the government has failed to sufficiently prove causation.  In fact, in the criminal case against Aegerion, the government joined the company's recommendation that the Court ***not*** Order any restitution to "private payors," *i.e.*, insurance companies like those at issue here.  It wrote at the time that, "to the extent apparent off-label prescriptions made it past payors' review processes, the government cannot link resulting payments made by payors to Aegerion's efforts to misbrand Juxtapid."  *United States v. Aegerion*, No. 17-CR-10288 (D. Mass.), Dkt. 33 at 11. Judge Young, relying in part on the government's about-face, declined to Order restitution in sentencing Mr. Moffett prior to his successful appeal:

> We had the corporation itself plead guilty here, there was restitution argued in that case, $7,200,000, that all went to the government. . . .  [T]hat's real, that's real money.  To argue now to impose upon this individual, who has no apparent ability to pay, there's no way he's going to come up with $1,700,000 or anything close to it. . . .  I balk for two reasons.  One, . . . I asked when I came to sentence Aegerion, I asked, I pressed, I wrote on the subject, why can't we figure out what the restitution is?  And I was

34

> told it's very complex and the like.  But it doesn't seem to be
> complex today, you had all the information then.  If he got bonuses
> from this fraud, and he did, . . . the company got the bulk of it and
> it was based on the fraud.  Why haven't we got the restitution from
> the company? . . . [I]t just seems to be a show, it doesn't mean
> anything, and I'm not . . . interested in participating in a show.

Oct. 28, 2021 Tr. 14-15.

These concerns about causation are more than merely hypothetical.  Patient RY, to whom the government ascribes more than $500,000 of the claimed loss, appears to have been approved for Juxtapid based on a diagnosis of hyperlipidemia, rather than HoFH, suggesting that any alleged misrepresentations regarding HoFH were not a but-for cause of the claimed loss.  When asked in a government interview, the insurer's Director of Compliance and Risk Management stated that he did not know why that approval occurred.

Second, for some of the patients included in the purported relevant conduct, the doctors' offices executed Juxtapid renewal forms (or forms to change the dosage of the prescription), with no involvement by Mr. Moffett.  *See* PSR ¶¶ 119, 121, 140.[19]  The government does not dispute Mr. Moffett's lack of any role in the submission of these forms, conclusively refuting its claim that "most, ***if not all***, of the pertinent Juxtapid prescription materials" have Mr. Moffett's handwriting "all over them."  Dkt. 242 at 6 (emphasis added).  Any claimed losses incurred after these submissions were not "directly and proximately" caused by Mr. Moffett's conduct.  *See, e.g.*, *United States v. Dillon*, 749 F. App'x 541, 543 (9th Cir. 2018) (unpublished) ("[W]e conclude that the district court properly deducted billings for services provided by contract

---

[19] After Dr. Goswami's patient was denied coverage, he similarly obtained coverage of "a competitor drug that (like Juxtapid) was approved only for HoFH patients."  PSR ¶ 135.

dentists because the only evidence is that those dentists performed their own examinations before providing services.  Their examinations constitute an 'intervening cause' that severs the chain of proximate causation between [the defendant's] fraudulent conduct and payments by the victim insurers." (citation omitted)).[20]  Based on documentation provided by the government, there appear to be $162,478.15 in claimed losses for RY post-dating the August 12, 2015 prescription authorization, and $31,289.10 in losses for CH post-dating the July 30, 2015 prescription authorization.  *See* Trial Ex. 294.  These amounts should be excluded from the restitution award.

Third, a substantial portion of the claimed loss appears to have been reimbursed by the government via the Medicare Part D program.  According to the Medicare Payment Advisory Commission, "Medicare pays plans individual reinsurance equal to 80 percent of covered spending above Part D's catastrophic threshold (in 2015, roughly $7,000 in total drug spending)."  MedPAC, Report to the Congress: Medicare and the Health Care Delivery System at 140 (June 2015), *available at* https://www.medpac.gov/wp-content/uploads/import_data/scrape_files/docs/default-source/reports/chapter-6-sharing-risk-in-medicare-part-d-june-2015-report-.pdf.  Based on documentation provided by the government, at least two patients included in the restitution calculation (RY and LG) were Medicare Part D members.  *See* Trial Ex. 294.  The government, however, does not appear to account for these reimbursements, which should reduce the "actual loss," compensable in restitution, to the

---

[20] There is no evidence that these prescriptions were authorized based on any prior fraudulent representations by Mr. Moffett.  *See* PSR Response to Defense Objection #9.  Rather, they required new documentation, including new affirmations regarding diagnoses consistent with HoFH, in which Mr. Moffett had no involvement.

insurers.  *United States v. De Jesus-Torres*, 64 F.4th 33, 43 (1st Cir. 2023).[21]

The defense does not intend to minimize the difficulty of the government's task in calculating restitution arising from the purported relevant conduct.  But Congress, in passing the mandatory restitution statute, specifically envisioned such difficulties of proof and decided that they should not inject unnecessary complexity into sentencing proceedings.  The statute expressly states that restitution is not appropriate where "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process."  18 U.S.C. § 3663A(c)(3)(B).  The defense submits that the present case satisfies this standard, providing a fourth independent reason to reject the government's restitution claim.

Fifth, the Court should decline to include the purported relevant conduct in its restitution award because it was not part of the same "scheme" to which Mr. Moffett pled guilty.  "[A] criminal defendant cannot be compelled to pay restitution for conduct committed outside the scheme, conspiracy, or pattern of criminal behavior underlying the offense of conviction." *United States v. Mayer*, 679 F. App'x 895, 902 (11th Cir. 2017) (unpublished).  Here, Mr. Moffett has admitted that he committed a wire fraud by instructing Dr. Dande's assistant to list an HoFH diagnosis on insurance forms with reckless disregard to whether that information was accurate.  Dr. Dande worked at Prairie Cardiovascular Consultants' ("PCC") Mattoon, Illinois office.  All of the other PCC doctors at issue worked at a different office about 90 minutes away

---

[21] The government entered into a $28.8 million settlement agreement with Aegerion that encompassed false claims to Medicare.  *See United States v. Aegerion*, 17-CR-10288 (D. Mass.), Dkt. 16-3.

in Springfield.  *See* PSR ¶ 83.  The two offices have entirely different nurses and support staff.
*See id.*  Accordingly, the only common participants in the count of conviction and purported
relevant conduct are Mr. Moffett and his co-workers at Aegerion.  *See United States v. Thomsen*,
830 F.3d 1049, 1068 (9th Cir. 2016) (holding it was "not enough" that "both schemes were
designed to obtain tax refunds by fraud and that [the defendant] was involved in both of them").
Additionally, Mr. Moffett committed the fraud to which he pled guilty via email.  He did not, as
the government alleges he did with respect to the other counts, sign any forms himself, nor did
he leverage his relationships with any doctor, nurse, or staff member because he had no such pre-
existing relationships.

Sixth, losses ascribed to uncharged Dr. Mishkel patient SG should be reduced by
$26,201.26 to match the documentation provided by the government.  *See* PSR ¶ 75.

Seventh, the government has violated 18 U.S.C. § 3664(d)(1)'s 60-day notice
requirement for restitution claims.  On March 14, 2024, less than a week before sentencing, the
government informed the defense of forthcoming claims from two insurance companies (which
have not been received as of this filing).  The defense respectfully submits that, in a case that has
been pending for nearly 6 years and was tried to a jury in 2019, there is no good reason for the
government's lack of compliance with statutory deadlines.

Finally, even assuming *arguendo*, and contrary to the above, that the Court finds Mr.
Moffett potentially liable for the full amount of restitution, it should nonetheless exercise its
discretion to "apportion liability . . . to reflect the level of contribution to the victim's loss and
economic circumstances of each defendant."  18 U.S.C. § 3664(h).  Here, the defense
respectfully submits that the Court should apportion Mr. Moffett's liability based on his ability to

pay, which, as reflected in the PSR and found by Judge Young, is far below the total amount claimed.  The defense further submits that the Court should hold Aegerion jointly and severally liable for any restitution obligation it imposes on Mr. Moffett, and apportion Mr. Moffett's liability to reflect his far lesser culpability as compared to the company.

Aegerion paid $7.2 million in restitution in connection with its misbranding guilty plea. All but $338.70 of that amount remains, unclaimed, in the clerk's office more than 6 years later. *See* PSR ¶ 81.  Judge Young, at Mr. Moffett's first sentencing, "expressed hesitation in ordering Moffett to pay the requested . . . restitution to the insurers," and ultimately declined to do so, based in part on the fact that "Aegerion had already paid over $7,000,000 . . . and that money could potentially be applied to reimburse the insurers."  *Id.*  The defense respectfully submits that this Court should follow suit.  It would be the height of formalism to preclude the untouched $7 million paid by Aegerion from being applied to the victims here.

## V.      The Court Should Limit Forfeiture to the Count of Conviction

The government did not request, and Judge Young accordingly did not Order, any forfeiture at Mr. Moffett's first sentencing.  The defense understands that a forfeiture Order is included in the parties' recommendations pursuant to the plea agreement now in place, but respectfully requests, for all of the reasons set forth *supra*, that such forfeiture be limited to the bonus Mr. Moffett obtained in connection with the sole count of conviction ($9,500).  The defense further requests that such forfeiture be offset by the $1,500 special assessment Mr. Moffett paid as a result of his now vacated convictions, bringing the net total to $8,000.

## VI.     Conclusion

For the greater part of five decades, Mr. Moffett did everything right.  He worked to

overcome a childhood marred by domestic violence, rise above his humble beginnings, pay his

own way through college, and become a well-established and highly respected pharmaceutical

sales representative.  Along the way, he proved himself time and again to be a consistently

caring, helpful, and empathetic family member, neighbor, and friend.  And, more than that, he

repeatedly demonstrated a willingness to help anyone, even a relative stranger, in need.  Here,

Mr. Moffett took a short-cut to get a drug that he thought would help a patient approved by

insurance.  Regardless of his company's instructions to the contrary, Mr. Moffett knew better.

What he did was wrong.  He deeply regrets his decision and the impact it has had on his innocent

family members and friends.  That mistake, though, should not completely outweigh a lifetime of

good deeds, hard work, kindness, and overall decency and humanity.  For all the reasons set forth

above, the defense respectfully requests that the Court impose a sentence of time-served.

Respectfully Submitted,
MARK MOFFETT
By His Attorney,

**/s/ Michael Pabian**
Michael Pabian, Esq.
Mass. Bar No. 684589
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
pabianlaw38@gmail.com

Dated: March 15, 2024

## CERTIFICATE OF SERVICE

I, Michael Pabian, hereby certify that on this date, March 15, 2024, a copy of the foregoing document has been served via Electronic Court Filing system on all registered participants.

**/s/ Michael Pabian**
Michael Pabian, Esq.